ORAL ARGUMENT NOT YET SCHEDULED

NO. 13-5118
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

REYMUNDO ZACARIAS MENDOZA, *et al.*,
*Plaintiffs-Appellants*,

v.

THOMAS E. PEREZ, in his official capacity, *et al.*,
*Defendants-Appellees*,

and

MOUNTAIN PLAINS AGRICULTURAL SERVICES, *et al.*,
*Intervenors-Appellees*.
_____

On Appeal from a Final Order of the
U.S. District Court for the District of Columbia
(Honorable Beryl A. Howell)

_____

**APPELLANTS' OPENING BRIEF**
_____

P. Alex McBean
UTAH LEGAL SERVICES, INC.
205 North 400 West
Salt Lake City, UT 84103
(801) 328-8891

Jennifer J. Lee
Migrant Farm Worker Division
COLORADO LEGAL SERVICES
1905 Sherman Street, Suite 400
Denver, CO 80203
(303) 866-9366

*Of Counsel*

August 22, 2013

Julie A. Murray
Michael T. Kirkpatrick
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

Edward Tuddenham
228 W. 137th Street
New York, NY 10030
(212) 234-5953

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

**(1) Parties and Amici.**

**U.S. District Court for the District of Columbia**

**Plaintiffs:** Reymundo Zacarias Mendoza, Francisco Javier Castro, Sergio Velasquez Catalan, and Alfredo Conovilca Matamoros

**Defendants:** U.S. Department of Labor; Hilda Solis, in her official capacity as U.S. Secretary of Labor; Seth D. Harris, in his official capacity as Acting U.S. Secretary of Labor[*]

**Intervenors:** Mountain Plains Agricultural Services, Western Range Association

**U.S. Court of Appeals for the District of Columbia Circuit**

**Plaintiffs-Appellants:** Reymundo Zacarias Mendoza, Francisco Javier Castro, and Sergio Velasquez Catalan

**Defendants-Appellees:** U.S. Department of Labor; Seth D. Harris, in his official capacity as Acting U.S. Secretary of Labor; Thomas E. Perez, in his official capacity as U.S. Secretary of Labor[**]

---

[*] Upon Secretary Solis's resignation, Seth D. Harris automatically substituted as a defendant in the district court. *See* Fed. R. Civ. P. 25(d).

[**] Thomas E. Perez automatically substituted as an appellee in this Court upon his confirmation as Secretary of Labor. *See* Fed. R. App. P. 43(c)(2).

i

**Intervenors-Appellees:** Mountain Plains Agricultural Services, Western Range Association

**Amici Curiae (Movants):** Southern Poverty Law Center, Migrant Farmworker Justice Project of Florida Legal Services, Comité de Apoyo a los Trabajadores Agrícolas, Pineros y Campesinos Unidos del Noroeste, Farmworker Rights Division of Georgia Legal Services, Farmworker Justice, and Equal Justice Center

**(2) Rulings Under Review.**

The plaintiffs appeal from a February 21, 2013, final order of the U.S. District Court for the District of Columbia disposing of their claim for lack of Article III and prudential standing. The district court's order and memorandum opinion are reproduced on pages 61 to 85 of the Joint Appendix. The memorandum opinion was also selected for publication and is available on Westlaw. *See Mendoza v. Solis*, _ F. Supp. 2d _, No. 11-1790, 2013 WL 632958 (D.D.C. Feb. 21, 2013) (Howell, J.).

**(3) Related Cases.**

This case has not previously come before this Court or any other court. The undersigned is not aware of any related cases as defined by Circuit Rule 28(a)(1)(C).

/s/ Julie A. Murray
Julie A. Murray

ii

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ...................................................................i

TABLE OF AUTHORITIES .....................................................................vi

GLOSSARY ......................................................................................... xiii

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION...........................................................2

STATUTES AND REGULATIONS ..........................................................3

STATEMENT OF ISSUES .......................................................................3

STATEMENT OF THE CASE....................................................................3

STATEMENT OF FACTS ........................................................................5

I.     Statutory and Regulatory Background ...........................................5

       A.    The Purpose and Mechanics of the H-2A Visa Program .....................5

       B.    DOL's Issuance of "Special Procedures" for Employment of Herders ...................................................................................8

             1.    Hours, frequency of pay, and timekeeping ................................9

             2.    Wages.......................................................................................10

             3.    Housing ....................................................................................15

II.    The Plaintiffs ................................................................................16

III.   The District Court's Decision.......................................................21

SUMMARY OF ARGUMENT ................................................................23

STANDING ...................................................................................26

ARGUMENT ................................................................................26

I.      Standard of Review...........................................................26

II.     The Plaintiffs Have Article III Standing to Pursue  Their  APA
        Challenge ...........................................................................26

        A.      The Plaintiffs Have Demonstrated That the TEGLS Injure
                Them in a Concrete and Particularized Way........................28

        B.      The Plaintiffs' Injury Is Capable of Redress by This Court ..............40

III.    The Plaintiffs Have Prudential Standing ......................................41

IV.     DOL Violated the APA by Issuing the TEGLS Without Notice
        and an Opportunity for Comment.......................................46

        A.      Because the TEGLS Alter Workers' and Employers'
                Rights and Interests, They Are Not Procedural Rules .......................48

        B.      Because the TEGLS Provide the Basis for DOL Actions
                and Effectively Amend the H-2A Regulations, They Are
                Not Interpretive Rules ...............................................49

                1.      The TEGLs serve as the legislative basis for agency
                        action .................................................................50

                2.      The TEGLs effectively amend the H-2A regulations..............53

        C.      Because The TEGLs Have a Binding Effect on the Parties,
                They Do Not Constitute a Statement of General Policy ....................55

        D.      DOL's Failure to Conduct Notice-and-Comment    Rulemaking
                Is Prejudicial.........................................................56

CONCLUSION................................................................................57

CERTIFICATE OF COMPLIANCE.....................................................59

CERTIFICATE OF SERVICE ................................................................60

ADDENDUM OF STATUTES AND REGULATIONS ..................................... A-1

Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*.................................. A-2
    8 U.S.C. § 1101, Definitions ..................................................... A-2
    8 U.S.C. § 1188, Admission of temporary H-2A workers ........................ A-2

20 C.F.R. Part 655,
Temporary Employment of Foreign Workers in the United States...................... A-5
    20 C.F.R. § 655.0, Scope and purpose of part............................................ A-5

20 C.F.R. Part 655, Subpart B,
Labor Certification Process for Temporary Agricultural Employment
in the United States ........................................................................ A-7
    20 C.F.R. § 655.100, Scope and purpose of subpart B ............................. A-7
    20 C.F.R. § 655.102, Special procedures ..................................... A-7
    20 C.F.R. § 655.103, Overview of this subpart and definition of terms .... A-8
    20 C.F.R. § 655.120, Offered wage rate...................................... A-9
    20 C.F.R. § 655.122, Contents of job offers................................ A-9
    20 C.F.R. § 655.130, Application filing requirements ........................... A-11
    20 C.F.R. § 655.135, Assurances and obligations of H-2A employers ... A-12
    20 C.F.R. § 655.143, Notice of acceptance ...................................... A-13
    20 C.F.R. § 655.158, Duration of positive recruitment........................... A-13
    20 C.F.R. § 655.161, Criteria for certification ...................................... A-14

# TABLE OF AUTHORITIES

*AFL-CIO v. Brock*,
    835 F.2d 912 (D.C. Cir. 1987)..................................................................5, 35

*AFL-CIO v. Chao*,
    227 F. Supp. 2d 102 (D.D.C. 2002)...............................................................54

*\*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982)..........................................1, 6, 25, 28, 30, 36

*\*American Mining Congress v. Mine Safety & Health Administration*,
    995 F.2d 1106 (D.C. Cir. 1993).....................................................................50

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004).......................................................................41

*Batterton v. Marshall*,
    648 F.2d 694 (D.C. Cir. 1980)................................................................48, 55

*Center for Law and Education v. Department of Education*,
    396 F.3d 1152 (D.C. Cir. 2005).....................................................................27

*Chamber of Commerce v. OSHA*,
    636 F.2d 464 (D.C. Cir. 1980).......................................................................50

*City of Idaho Falls v. FERC*,
    629 F.3d 222 (D.C. Cir. 2011).......................................................................54

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003).......................................................................28

*Clapper v. Amnesty International USA*,
    133 S. Ct. 1138 (2013)...................................................................................27

*Clarke v. Securities Industry Ass'n*,
    479 U.S. 388 (1987).......................................................................................42

*\* Authorities upon which we chiefly rely are marked with asterisks.*

*Comité de Apoyo a los Trabajadores Agrícolas v. Solis*,
No. 09-240, 2010 WL 3431761 (E.D. Pa. Aug. 30, 2010)...............30, 51, 52

*De Jesus Ramirez v. Reich*,
156 F.3d 1273 (D.C. Cir. 1998)......................................................42

*Electronic Privacy Information Center v. DHS*,
653 F.3d 1 (D.C. Cir. 2011).............................................47, 48, 55

*Feller v. Brock*,
802 F.2d 722 (4th Cir. 1986).........................................................35

*Florida Audubon Society v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) (en banc)..........................................27

*Friends of Blackwater v. Salazar*,
691 F.3d 428 (D.C. Cir. 2012).......................................................46

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000).....................................................................37

*Grocery Manufacturers Ass'n v. EPA*,
693 F.3d 169 (D.C. Cir. 2012).......................................................42

*Hernandez Flecha v. Quiros*,
567 F.2d 1154 (1st Cir. 1977)........................................................44

*International Brotherhood of Teamsters v. Peña*,
17 F.3d 1478 (D.C. Cir. 1994).......................................................35

*International Longshoremen's & Warehousemen's Union v. Meese*,
891 F.2d 1374 (9th Cir. 1989) .......................................................30

*International Union of Bricklayers & Allied Craftsmen v. Meese*,
761 F.2d 798 (D.C. Cir. 1985).................................................34, 44

*JEM Broadcasting Co., Inc. v. FCC*,
22 F.3d 320 (D.C. Cir. 1994).................................................49, 51

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...............................................................26, 27, 40

\*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   132 S. Ct. 2199 (2012).......................................................41, 42, 46

*McLouth Steel Products Corp. v. Thomas*,
   838 F.2d 1317 (D.C. Cir. 1988).....................................................56

*Monsanto Co. v. Geertson Seed Farms*,
   130 S. Ct. 2743 (2010)..................................................................27

*NB ex rel. Peacock v. District of Columbia*,
   682 F.3d 77 (D.C. Cir. 2012).....................................................27, 41

*National Ass'n of Manufacturers v. DOL*,
   No. 95-0715, 1996 WL 420868 (D.D.C. July 22, 1996)........................52, 53

*National Family Planning & Reproductive Health Ass'n, Inc. v. Sullivan*,
   979 F.2d 227 (D.C. Cir. 1992).....................................................50, 54

*Orengo Caraballo v. Reich*,
   11 F.3d 186 (D.C. Cir. 1993).........................................................5, 6

*Scheduled Airlines Traffic Offices, Inc. v. DOD*,
   87 F.3d 1356 (D.C. Cir. 1996).....................................................25, 45

*Settles v. United States Parole Commission*,
   429 F.3d 1098 (D.C. Cir. 2005)........................................................26

\*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005)...........................................................31

*Sherley v. Sebelius*,
   610 F.3d 69 (D.C. Cir. 2010)...........................................................34

*Sierra Club v. EPA*,
   699 F.3d 530 (D.C. Cir. 2012).................................................28, 41, 47

viii

*Snake River Farmers' Ass'n, Inc. v. DOL*,
      9 F.3d 792 (9th Cir. 1993) ...............................................................37

*Sprint Corp. v. FCC*,
      315 F.3d 369 (D.C. Cir. 2003)........................................................56

*Steinhorst Associates v. Preston*,
      572 F. Supp. 2d 112 (D.D.C. 2008)................................................54

*Sugar Cane Growers Cooperative of Florida v. Veneman*,
      289 F.3d 89 (D.C. Cir. 2002).......................................27, 39, 41, 56

*Summers v. Earth Island Institute*,
      555 U.S. 488 (2009)........................................................26, 28, 41

*United States v. Picciotto*,
      875 F.2d 345 (D.C. Cir. 1989).......................................................55

*United States Telecom Ass'n v. FCC*,
      400 F.3d 29 (D.C. Cir. 2005).........................................................49

*United Transportation Union v. ICC*,
      891 F.2d 908 (D.C. Cir. 1989)........................................................34

## STATUTES AND FEDERAL RULES

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................2

Administrative Procedure Act
      5 U.S.C. § 551(4)..........................................................................47
      5 U.S.C. § 553.....................................................................3, 46, 48
      5 U.S.C. § 553(b)   .......................................................................47
      5 U.S.C. § 553(c)......................................................................47, 54
      5 U.S.C. § 702...............................................................................41
      5 U.S.C. § 706 ...............................................................................56

Fair Labor Standards Act
      29 U.S.C. § 213(a)(6)(E) ...............................................................33

Federal Rule of Civil Procedure 4(a)(1)(B) ................................................................3

Federal Rule of Civil Procedure 12(b)(1) ........................................................4, 21, 26

Immigration and Nationality Act
    8 U.S.C. § 1101(a)(15)(H)(ii)(a) ................................................................5
    8 U.S.C. § 1188 ................................................................5, 6, 24, 43
    8 U.S.C. § 1188(a) ........................................22, 24, 29, 28, 36
    8 U.S.C. § 1188(a)(1) ........................................1, 5, 6, 25
    8 U.S.C. § 1188(a)(1)(B) ........................................32, 57
    8 U.S.C. § 1188(b) ................................................................7
    8 U.S.C. § 1188(b)(4) ................................................................7
    8 U.S.C. § 1188(c)(4) ........................................................7, 15

## REGULATIONS

20 C.F.R. §§ 654.405-407, 410-412 ................................................................15

20 C.F.R. Part 655, Temporary Employment of Foreign Workers in the
    United States
    20 C.F.R. § 655.0(a)(2) ........................................6, 23, 28, 29, 37, 44
    20 C.F.R. § 655.0(a)(3) ................................................................6

20 C.F.R. Part 655, Subpart B, Labor Certification Process for Temporary
    Agricultural Employment in the United States ........................................1, 6
    20 C.F.R. § 655.100 ................................................................6
    20 C.F.R. § 655.102 ........................................................54, 55
    20 C.F.R. § 655.103(b) ........................................................13, 17
    20 C.F.R. § 655.120(a) ........................................................10, 11
    20 C.F.R. § 655.122(c) ................................................................7
    20 C.F.R. § 655.122(d)(1) ........................................................14, 15
    20 C.F.R. § 655.122(d)(2) ................................................................16
    20 C.F.R. § 655.122(j) ................................................................10
    20 C.F.R. § 655.122(l) ................................................................10
    20 C.F.R. § 655.122(m) ................................................................10
    20 C.F.R. § 655.125(c) ................................................................7
    20 C.F.R. § 655.130(a) ................................................................6
    20 C.F.R. § 655.135(d) ................................................................8
    20 C.F.R. § 655.143(a) ................................................................7
    20 C.F.R. § 655.143(b)(1) ................................................................7

20 C.F.R. § 655.143(b)(2) ...........................................................7
20 C.F.R. § 655.158.....................................................................8
20 C.F.R. § 655.161 .....................................................................7

29 C.F.R. §§ 780.325-780.326...................................................33

29 C.F.R. § 780.327 ...................................................................33

29 C.F.R. § 1910.142 .................................................................15

## FEDERAL REGISTER DOCUMENTS

DOL, Employment and Training Administration, Final Rule: Temporary
    Agricultural Employment of H-2A Aliens in the United States,
    75 Fed. Reg. 6884 (Feb. 12, 2010) ........... 6, 10, 11, 12, 13, 16, 32, 35, 36, 57

DOL, Employment and Training Administration, Notice: Labor
    Certification Process for the Temporary Employment of Aliens in
    Agriculture in the United States: 2013 Adverse Effect Wage Rates,
    78 Fed. Reg. 1259 (Jan. 8, 2013) ..................................................14

DOL, Employment and Training Administration, Notice: Prevailing
    Wage Rates for Certain Occupations Processed Under H-2A
    Special Procedures; Correction and Rescission,
    78 Fed. Reg. 19,019 (Mar. 28, 2013) ....................................14, 18, 19, 38, 40

DOL, Employment and Training Administration, Notice: Training and
    Employment Guidance Letter No. 15-06, Change 1, Special
    Procedures: Labor Certification Process for Occupations Involved in
    the Open Range Production of Livestock Under the H-2A Program,
    76 Fed. Reg. 47,243 (Aug. 4, 2011) ...................... 8, 9, 10, 11, 13, 14, 16, 53

DOL, Employment and Training Administration, Notice: Training and
    Employment Guidance Letter No. 32-10, Special Procedures: Labor
    Certification Process for Employers Engaged in Sheepherding and
    Goatherding Occupations Under the H-2A Program,
    76 Fed. Reg. 47,256 (Aug. 4, 2011) ...................... 8, 9, 10, 11, 13, 14, 16, 53

## MISCELLANEOUS

DOL, Employment and Training Administration, Field Memorandum 24-01, Special Procedures: Labor Certification for Sheepherders and Goatherders Under the H-2A Program (Aug. 1, 2001) ...................................9

DOL, Employment and Training Administration, H-2A Application for Temporary Employment Certification, ETA Form 9142A – Appendix A, *available at* http://www.foreignlaborcert.doleta.gov/pdf/ETA_ Form_9142A_ Appendix.pdf ...............................................................................................7

DOL, Employment and Training Administration, Training and Employment Guidance Letter No. 15-06, Special Procedures for Occupations Involved in the Open Range Production of Livestock (Feb. 9, 2007) ............9

DOL, Information and Resources, Online Wage Library (revised 2010), *available at* http://www.foreignlaborcert.doleta.gov/wages.cfm..................33

DOL, Office of Foreign Labor Certification, H-2A Temporary Agricultural Visa Program, FY 2012 – Quarter 3: Select Statistics, *available at* http://www.foreignlaborcert.doleta.gov/pdf/h_2a_selected_statistics.pdf....12

DOL, Office of Foreign Labor Certification, H-2A Temporary Agricultural Visa Program – Selected Statistics, FY 2012 YTD, *available at* http://www.foreignlaborcert.doleta.gov/pdf/h_2a_temp_ agricultural_visa_2012.pdf ..........................................................................12

Jennifer L. Lee & Kyle Endres, Overworked and Underpaid: H-2A Herders in Colorado (2010), *available at* http://users.frii.com/cls/Overworked %20and%20Underpaid.pdf ..................................................................14, 16

O-Net Online, Summary Report for Farmworkers, Farm, Ranch, and Aquacultural Animals, Code 45-2093.00, *available at* http://www.onetonline.org/link/summary/45-2093.00..................................33

# GLOSSARY

| | |
|---|---|
| AEWR | Adverse Effect Wage Rate |
| APA | Administrative Procedure Act |
| DOL | U.S. Department of Labor |
| ETA | Employment and Training Administration |
| FLSA | Fair Labor Standards Act |
| INA | Immigration and Nationality Act |
| MPAS | Collectively, Mountain Plains Agricultural Services and Western Range Association |
| OFLC | Office of Foreign Labor Certification |
| OSHA | Occupational Safety and Health Administration |
| TEGL | Training and Employment Guidance Letter |

# INTRODUCTION

Through the H-2A visa program, the Immigration and Nationality Act (INA) permits employers to import foreign agricultural workers, including sheepherders and open range livestock workers (collectively, herders), only if the Department of Labor (DOL) certifies that able, willing, and qualified U.S. workers are not available for the positions and that the employment of foreign workers will not adversely affect similar U.S. workers' wages and working conditions. 8 U.S.C. § 1188(a)(1). DOL's certification is intended to ensure that available U.S. workers receive a job preference over foreign workers and that an influx of foreign labor does not cause U.S. workers' wages and working conditions to stagnate or fall. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 596 (1982) (referring to substantially similar DOL regulations applicable to predecessor H-2 program). DOL has adopted regulations by notice-and-comment rulemaking that govern this certification for the H-2A visa program. *See* 20 C.F.R. Part 655, Subpart B.

In 2011, DOL issued two documents called Training and Employment Guidance Letters (TEGLs) without notice-and-comment rulemaking. The TEGLs announce "special procedures" governing the certification of H-2A herder positions. These special procedures exempt employers seeking certification of H-2A herders from many of the minimum terms and conditions of work applicable by

1

regulation to all other H-2A employers and, instead, set far lower and less protective standards for these two categories of agricultural workers.

The plaintiffs, three individuals who are able, willing, qualified, and available to be herders, challenge DOL's adoption of the TEGLs without notice-and-comment rulemaking as a violation of the Administrative Procedure Act (APA). They contend that the TEGLs, which set wages and working conditions below levels required by the INA, reduce their access to herding job opportunities at statutorily-required, non-depressed wages and working conditions. They also contend that the TEGLs depress the wages and working conditions of similarly employed U.S. workers, such as one of the plaintiffs who is currently employed as a ranch hand. The district court's dismissal of the case for lack of Article III and prudential standing ignores the rights accorded the plaintiffs under the INA, cannot be reconciled with the record evidence, and is at odds with this Court's precedent.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction to consider plaintiffs' claim under 28 U.S.C. § 1331. The court entered a final order and memorandum opinion dismissing plaintiffs' claim on February 21, 2013, for lack of subject-matter jurisdiction based on standing. Joint Appendix (JA) 61-85. Three of the four plaintiffs timely appealed on April 22, 2013. Dist. Ct. Doc. (hereinafter, Doc.) 42,

Notice of Appeal; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are contained in an addendum bound with this brief.

## STATEMENT OF ISSUES

(1) Whether plaintiffs-appellants have Article III standing to bring their APA challenge;

(2) Whether plaintiffs-appellants have prudential standing to bring their APA challenge; and

(3) Whether DOL's issuance of the challenged TEGLs without notice and an opportunity for public comment violated the APA.

## STATEMENT OF THE CASE

Plaintiffs-appellants Reymundo Zacarias Mendoza, Francisco Javier Castro, and Sergio Velasquez Catalan filed suit against DOL and the Secretary of Labor in October 2011.[2] Doc. 1, Compl., JA6. They contend that the TEGLs constitute legislative rules that should have been subject to notice-and-comment rulemaking under the APA, 5 U.S.C. § 553. *Id.* ¶ 20, JA12. The plaintiffs seek a declaratory

---

[2] A fourth plaintiff, Alfredo Conovilca Matamoros, participated in the district court but did not appeal.

judgment that DOL violated the APA by issuing the TEGLs without notice and an opportunity for public comment and an order vacating in part and enjoining future use of the TEGLs. *Id.*, Prayer for Relief, JA12.

Mountain Plains Agricultural Services and the Western Range Association (collectively, MPAS), two groups representing employers in the herding industry, intervened. Doc. 15, Mot. to Intervene. MPAS moved to dismiss the plaintiffs' claim under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III and prudential standing. Doc. 18, Mot. to Dismiss. DOL did not join that motion and did not contest plaintiffs' standing. While the motion to dismiss was pending, the parties cross-moved for summary judgment on the APA claim. MPAS renewed its standing argument at summary judgment; again, DOL did not join that argument.

In February 2013, the district court granted MPAS's 12(b)(1) motion to dismiss for lack of standing on both Article III and prudential grounds. Doc. 40, Final Order, JA61; Doc. 41, Mem. Op., JA62. The court considered exhibits, including plaintiffs' declarations, submitted in support of briefing on the motion to dismiss. Mem. Op., JA71.

## STATEMENT OF FACTS

### I.    Statutory and Regulatory Background

### A.    The Purpose and Mechanics of the H-2A Visa Program

The H-2A visa program, named after the statutory provision of the INA that describes the relevant visa category, 8 U.S.C. § 1101(a)(15)(H)(ii)(a), permits agricultural employers to obtain work visas for foreign workers to perform temporary or seasonal agricultural work in the United States. Sheepherders and open range production of livestock workers (in lay terms, cattle herders who work on the range rather than on ranches) qualify as agricultural workers under the H-2A program.

Before the government may issue visas in response to an employer's petition for foreign workers under the H-2A program, § 1188 of the INA requires DOL to certify that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

> (B) the employment of the alien[s] in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Section 1188 reflects "Congress' resolve that American workers not be injured by immigration policies." *AFL-CIO v. Brock*, 835 F.2d 912, 914 (D.C. Cir. 1987); *accord Orengo Caraballo v. Reich*, 11 F.3d 186, 190 (D.C.

5

Cir. 1993); 20 C.F.R. § 655.0(a)(3). It does so by guaranteeing that U.S. workers "are given a preference over foreign workers for jobs that become available" and, "to the extent that foreign workers are brought in, the working conditions of domestic employees are not . . . adversely affected." *Snapp*, 458 U.S. at 596.

DOL has adopted regulations, most recently amended by notice-and-comment rulemaking in 2010, that govern the labor certification process required by 8 U.S.C. § 1188. *See* 20 C.F.R. Part 655, Subpart B; DOL, Employment and Training Administration (ETA), Final Rule: Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884 (Feb. 12, 2010) (hereinafter, H-2A Final Rule). Through those regulations, DOL sets minimum terms and conditions of work that employers must offer U.S. workers to determine the workers' availability to fill an employer's jobs. 20 C.F.R. §§ 655.0(a)(2), 655.100. As DOL recognizes, U.S. workers cannot be expected to accept jobs at substandard wages or working conditions. *Id.* § 655.0(a)(2). The minimum wages and working conditions set by DOL ensure that, if U.S. workers are not available, the employment of foreign workers will not adversely affect the wages and working conditions of similarly employed U.S. workers. *Id.*

DOL's regulations require an employer seeking to obtain H-2A visas to file with the agency's Office of Foreign Labor Certification (OFLC) an application and a job order describing the terms and conditions of work. *Id.* §§ 655.130(a),

6

655.122(c). In the application, the employer must agree to offer, at a minimum, the terms and conditions of work that DOL has determined are necessary to gauge whether any U.S. workers are available to fill the jobs and to avoid an adverse effect on similarly employed U.S. workers. DOL, ETA, H-2A Application for Temporary Employment Certification, ETA Form 9142A – Appendix A, at A.1, *available at* http://www.foreignlaborcert.doleta.gov/pdf/ETA_Form_9142A_ Appendix.pdf.

If the application is complete and meets DOL standards, DOL accepts it for consideration, 20 C.F.R. § 655.143(a), and authorizes circulation of the job order in the state where the proposed positions would be and in any other states that it determines are "potential sources of U.S. workers," *id.* § 655.143(b)(1). It also instructs the employer to engage in its own efforts to recruit U.S. workers for the available positions. *Id.* § 655.143(b)(2); *see also* 8 U.S.C. § 1188(b)(4) (requiring "positive recruitment efforts"); *accord* 20 C.F.R. § 655.125(c).

Based on the response from U.S. workers to the job order and the employer's recruitment efforts, DOL determines whether able, willing, and qualified U.S. workers are available to fill the positions. *Id.* § 655.161. Only if U.S. workers are unavailable may DOL certify the importation of H-2A workers in response to the employer's petition. 8 U.S.C. §§ 1188(b), (c)(3)(A). Moreover, even if DOL certifies an employer's need for an H-2A worker, the employer

generally has an obligation to continue to recruit U.S. workers on terms that comply with DOL's minimum standards for wages and working conditions until the date that the H-2A worker leaves his home to reach the employer's workplace. 20 C.F.R. § 655.158. Until 50 percent of the work period is complete, the employer also has an obligation to replace an H-2A worker with a qualified, eligible U.S. worker who applies for the job. *Id.* § 655.135(d).

> **B.    DOL's Issuance of "Special Procedures" for Employment of Herders**

Although the regulatory procedures and requirements described above apply to all H-2A applications, in August 2011, DOL issued two TEGLs establishing "special procedures" for the labor certification of herders. *See* DOL, ETA, Notice: TEGL No. 15-06, Change 1, Special Procedures: Labor Certification Process for Occupations Involved in the Open Range Production of Livestock Under the H-2A Program, 76 Fed. Reg. 47,243 (Aug. 4, 2011) (hereinafter, Open Range TEGL), JA31; DOL, ETA, Notice: TEGL No. 32-10, Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program, 76 Fed. Reg. 47,256 (Aug. 4, 2011) (hereinafter, Sheepherding TEGL), JA37. DOL published the TEGLs in the Federal Register, but it did not conduct notice-and-comment rulemaking before adopting them. The TEGLs superseded previous special procedures, also issued without notice and an opportunity for comment, that had been in effect for herders.

8

*See* Doc. 28-4, DOL, ETA, TEGL No. 15-06, Special Procedures for Occupations Involved in the Open Range Production of Livestock (Feb. 9, 2007); Doc. 28-3, DOL, ETA, Field Memorandum 24-01, Special Procedures: Labor Certification for Sheepherders and Goatherders Under the H-2A Program (Aug. 1, 2001).

DOL describes the TEGLs as "guidance." *See* Open Range TEGL, JA32; Sheepherding TEGL, JA38. But, in fact, the special procedures enshrined in the TEGLs carve out herders from the otherwise generally applicable regulations for the H-2A program. *See* Open Range TEGL, JA32 ("Unless otherwise specified in [the TEGL], applications submitted for [open range production of livestock] occupations must comply with the requirements for processing H-2A applications contained at 20 CFR part 655, subpart B."); Sheepherding TEGL, JA38 (same with respect to sheepherders). As a result of this carve-out, herding employers that participate or seek to participate in the H-2A program are permitted to obtain DOL certification to import foreign workers by offering wages and working conditions that have never been subjected to notice-and-comment rulemaking. As described below, those wages and working conditions are far lower than those set by the DOL regulations applicable to all other H-2A jobs.

*1.    Hours, frequency of pay, and timekeeping.* Under the general H-2A regulations, employers must keep track of employee hours. In contrast, under the

TEGLs' "special procedures," herding employers need not do so.[3] Indeed, under the TEGLs, herders are on call 24 hours a day, every day.[4] Moreover, although the H-2A regulations require employers to pay workers at a minimum on a bimonthly basis, the TEGLs exempt herding employers from that requirement, instead permitting payment on a monthly basis (by agreement of the worker).[5]

   *2.*    ***Wages.*** The TEGLs also allow herder wages that are lower than, and calculated using a different methodology from, the wages set by the general H-2A regulations. Specifically, the general H-2A regulations require employers to pay the highest of an adverse effect wage rate (AEWR), a prevailing wage or piece rate, a collective bargaining rate, or the federal or state minimum wage. 20 C.F.R. § 655.120(a); *see also id.* § 655.122(l). The AEWR, which is unique to the H-2A program, is generally higher than the other wages listed in the H-2A regulations, *see* H-2A Final Rule, 75 Fed. Reg. at 6894 n.7, and is specifically designed to offset the depressive effect that an influx of foreign workers has on wages in the agricultural labor market, *id.* at 6891-92. In contrast, the prevailing wage roughly

---

   [3] *Compare* 20 C.F.R. § 655.122(j), *with* Open Range TEGL, Part A.I.C.5, JA34, and Sheepherding TEGL, Part A.I.C.6, JA40.

   [4] *See* Open Range TEGL, Part A.I.C.1, JA33; Sheepherding TEGL, Part A.I.C.1, JA40.

   [5] *Compare* 20 C.F.R. § 655.122(m), *with* Open Range TEGL, Part A.I.C.6, JA34, and Sheepherding TEGL, Part A.I.C.7, JA40.

corresponds to the local "going rate" for a job in light of market forces, where the market reflects the presence of foreign workers.

By requiring an H-2A employer to pay an AEWR, instead of just a prevailing wage, the general H-2A regulations ensure that U.S. workers have access to job opportunities at wages that are not depressed by the presence of foreign workers. *Id.* As DOL has explained, the AEWR is intended "to approximate the equilibrium wage that would result absent an influx of temporary foreign workers." *Id.* at 6893. The use of an AEWR is based on the theory that, absent the importation of foreign workers, a critical labor shortage would lead to a rise in wages over time. *Id.* at 6892. Thus, an AEWR "in essence" imposes "a prevailing wage concept defined over a broader geographic or occupational field." *Id.* at 6893. In short, it attempts to "put incumbent farm workers in the position they would have been in but for the H-2A program." *Id.* at 6891.

The TEGLs, however, exempt herding employers from the general H-2A requirement that employers pay an AEWR. The TEGLs instead require only a prevailing wage. *See* Open Range TEGL, Part A.I.A, JA32; Sheepherding TEGL, Part A.I.A, JA38-39. As support for this exemption, DOL relies on 20 C.F.R. § 655.120(a), which purports to exempt employers from paying an AEWR if DOL approves "a special procedure . . . for an occupation or specific class of agricultural employment." *See* Open Range TEGL, Part A.I.A, JA32; Sheepherding TEGL,

11

Part A.I.A, JA38. However, as DOL itself determined in the H-2A Final Rule, it cannot be assumed that payment of a prevailing wage to H-2A workers will "have no adverse effect on U.S. workers." H-2A Final Rule, 75 Fed. Reg. at 6895. Such an assumption "is not valid in the H-2A context" because the program, which permits an uncapped number of visas, "can involve large numbers of foreign workers entering a specific labor market." *Id.* "Under these circumstances, there is a heightened risk that the employment of foreign workers may produce wage stagnation in the local labor market." *Id.*

These observations apply with equal force in the narrower context of herding. Herding operations are heavily dependent on H-2A herders, and DOL permits thousands of H-2A herders to enter the United States each year, for example, certifying for admission more than 3,500 sheepherders in 2012. DOL, Office of Foreign Labor Certification (OFLC), H-2A Temporary Agricultural Visa Program – Selected Statistics, FY 2012 YTD, *available at* http://www.foreignlabor cert.doleta.gov/pdf/h_2a_temp_agricultural_visa_2012.pdf. Moreover, the presence of herders is indisputably concentrated in numerous Western states, exacerbating the effect of foreign herders on U.S. workers in these areas. *See* DOL, OFLC, H-2A Temporary Agricultural Visa Program, FY 2012 – Quarter 3: Select Statistics, at 2, *available at* http://www.foreignlaborcert.doleta.gov/pdf/h_ 2a_selected_statistics.pdf (listing top states for sheep-related H-2A workers,

including sheepherders, and stating, for example, that 42 percent of such workers were certified for positions in Utah).

DOL also applies a different methodology for calculating the AEWR required by the general H-2A regulations than it does for calculating the prevailing wage authorized by the TEGLs. Under the general H-2A regulations, the AEWR is calculated based on data from the U.S. Department of Agriculture's Farm Labor Survey, and it is equal to the annual average of combined crop and livestock workers' wages. H-2A Final Rule, 75 Fed. Reg. at 6891; 20 C.F.R. § 655.103(b). DOL generally sets AEWRs by combining data for multi-state regions. H-2A Final Rule, 75 Fed. Reg. at 6896. The AEWR is thus "derived from data across a relatively broad geographic and occupational span," which "reflects the view that farm labor is mobile across relatively wide areas and farm laborers' skills are adaptable across a relatively wide range of crop or livestock activities and occupations." *Id.* at 6899.

In contrast, DOL sets the prevailing wage for herders based on reports from State Workforce Agencies, which conduct surveys of local employers in accordance with special DOL procedures.[6] The wage is set on a state-by-state

---

[6] *See* Open Range TEGL, Part A.I.A, JA33; Sheepherding TEGL, Part A.I.A, JA39; *see also* Doc. 28-5, ETA Handbook No. 385 (describing survey procedures on which the TEGLs rely).

basis, *see* Open Range TEGL, Part A.I.A, JA32-33; Sheepherding TEGL, Part A.I.A, JA39, although many states have equivalent wages.

The distinction in required wages between the H-2A regulations and the TEGLs has an enormous practical impact on workers. Current AEWRs under the general H-2A regulations range from $9.50 to $12.72 per hour plus free housing. *See* DOL, ETA, Notice: Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: 2013 Adverse Effect Wage Rates, 78 Fed. Reg. 1259, 1259 (Jan. 8, 2013); 20 C.F.R. § 655.122(d)(1). In contrast, the current prevailing wage for sheepherders is $750 per month plus room and board in all herding states except California, Nevada, and Oregon, where the prevailing wage is somewhat higher, and the current prevailing wage for open range production of livestock workers is $875 per month plus room and board in all herding states. DOL, ETA, Notice: Prevailing Wage Rates for Certain Occupations Processed Under H-2A Special Procedures; Correction and Rescission, 78 Fed. Reg. 19,019, 19,020 (Mar. 28, 2013) (hereinafter 2013 Prevailing Wage Rate Correction). Herders commonly work 80 hours or more per week (or roughly 320 hours per month) and are on call 24 hours a day, 7 days a week. *See* Jennifer Lee & Kyle L. Endres, Overworked and Underpaid: H-2A Herders in Colorado 18 (2010), *available at* http://users.frii.com/cls/Overworked %20and%20Underpaid.pdf (finding that more than 60 percent of herders in one

14

survey reported working more than 80 hours per week). Thus, even if one counts only 80 hours worked per week, and ignores on-call time, sheepherders working for a monthly wage of $750 earn as little as $2.34 per hour, plus room and board, and open-range livestock workers earn as little as $2.73 per hour, plus room and board. These exceedingly low wages are made possible by the TEGLs.

In sum, the TEGLs exempt herding employers from the general H-2A requirement to pay an AEWR, and instead permit employers to pay a prevailing wage, which DOL has determined is insufficient to prevent depression of U.S. workers' wages and working conditions.

**3.    *Housing.*** Consistent with the INA's mandate, *see* 8 U.S.C. § 1188(c)(4), the H-2A regulations require employer-provided housing to comply with Occupational Safety and Health Administration (OSHA) standards. 20 C.F.R. § 655.122(d)(1). The general H-2A regulations direct employers to provide housing that meets certain minimum standards, such as running water, electricity, toilet facilities, and a minimum amount of square footage of living space for each worker. *See* 29 C.F.R. § 1910.142(b)-(g); *id.* §§ 654.405-407, 410-412.

Although the INA long ago required DOL to "issue regulations" addressing "the specific requirements of housing for employees principally engaged in the range production of livestock," 8 U.S.C. § 1188(c)(4), DOL has not done so. Instead, under the current regulatory scheme, the H-2A regulations require range

15

housing to comply with separate "guidelines" issued by OFLC. 20 C.F.R.
§ 655.122(d)(2); *see* Sheepherding TEGL, Part B.I, JA42. The TEGLs are those
"guidelines." Under the TEGLs, H-2A employers need not provide herders who
live in mobile housing the same housing conditions that are normally required
under the H-2A program. In contrast to the running water, electricity, toilets, and
minimum square footage required to be offered by other H-2A employers, herding
employers need offer none of these things. *See* Open Range TEGL, Part B.II.B-D,
F-G, JA34-35; Sheepherding TEGL, Part B.II.B-D, F-G, JA42-43. *See generally*
Lee & Endres, Overworked and Underpaid: H-2A Herders in Colorado (providing
photographs of herder housing). The TEGLs also impose weaker housing
inspection standards than those required by the H-2A regulations. *Compare* Open
Range TEGL, Part B.I, JA34, *and* Sheepherding TEGL, Part B.1, JA42, *with* H-2A
Final Rule, 75 Fed. Reg. at 6908.

## II.    The Plaintiffs

Plaintiffs Zacarias Mendoza, Castro, and Velasquez Catalan have substantial
experience in sheepherding or the open range production of livestock, both in their
countries of origin and in the United States. Each originally came to the United
States as an H-2A sheepherder or open range production of livestock worker, but
all three left the program because of abusive conditions. *See* Mendoza Decl. ¶ 9,
JA46; Castro Decl. ¶¶ 3-4, JA51-52; Catalan Decl. ¶¶ 3-4, JA56. Each of the

plaintiffs currently has a lawful immigration status and is authorized to work in the United States. Mendoza Decl. ¶ 8, JA47; Castro Decl. ¶ 6, JA52; Catalan Decl. ¶ 7, JA56. Thus, the plaintiffs are now "U.S. workers" as that term is used in the H-2A regulations governing labor certification. *See* 20 C.F.R. § 655.103(b).

Zacarias Mendoza, Castro, and Velasquez Catalan, residents of Utah and Washington, are able, willing, qualified, and available to work as herders. Although each plaintiff has a specific and concrete desire to do herding work, none of them will accept a herding position under the current wages and working conditions allowed by the TEGLs and common in the industry. *See* Mendoza Decl. ¶¶ 9-11, JA47; Castro Decl. ¶¶ 7-9, JA52; Catalan Decl. ¶¶ 8-10, JA56-57. They contend that the TEGLs have an adverse impact on the herder labor market, Mendoza Decl. ¶ 12, JA48; Castro Decl. ¶ 10, JA52; Catalan Decl. ¶ 11, JA57, in direct violation of Congress' mandate that U.S. workers get priority for herding jobs at non-depressed wages. Thus, the TEGLs reduce the plaintiffs' access to statutorily-required, non-depressed wages and working conditions.

A.     Mr. Zacarias Mendoza came to the United States as an H-2A worker from Peru, where he was a farmer. From 2009 to 2010, he worked as an H-2A sheepherder in Wyoming. His employers repeatedly failed to provide him with sufficient food, and after he complained to DOL, he was fired. Mendoza Decl. ¶ 5, JA46. After leaving his H-2A job, Mr. Zacarias Mendoza became a lawful

17

permanent resident of the United States. *Id.* ¶ 8, JA47. From March to May 2011, he worked as a ranch hand tending cattle in Henefer, Utah, for an employer who also employed H-2A workers, and he has had a series of temporary jobs since that time. *Id.* ¶¶ 6-7, JA46-47.

Since leaving his job as an H-2A herder, Mr. Zacarias Mendoza has "sought work as a herder," and herding is his preferred occupation. *Id.* ¶¶ 10-11, JA47. However, he has "been unable to find such work with decent wages and working conditions." *Id.* ¶ 11, JA47. He has not sought work as a herder since leaving Henefer, Utah, because he is not aware of any herder positions except in California that pay more than the $750-a-month prevailing wage allowed by the TEGLs. *Id.* ¶ 13, JA48; *see* DOL, 2013 Prevailing Wage Rate Correction, 78 Fed. Reg. at 19,020 (prevailing wage of $750 plus room and board for Utah). He has spoken to herders who say that their employers refuse to provide raises because the law requires them only to pay $750. Mendoza Decl. ¶ 12, JA 48.

   **B.**     Mr. Castro worked with livestock in his native Chile and with sheep in Argentina. Castro Decl. ¶ 2, JA51. He is from an agricultural family and has worked nearly all of his life with animals. *Id.* Mr. Castro was recruited to come to the United States as an H-2A sheepherder in 2008. *Id.* ¶ 3, JA51. He left his H-2A sheepherding job in the spring of 2010, however, because of mistreatment by his

18

employer. His employer failed to provide him with sufficient food and withheld his documents and wages. *Id.* ¶ 4, JA51-52.

Mr. Castro is now a legal permanent resident and is authorized to work in the United States. *Id.* ¶ 6, JA52. He considers working with animals to be his "specialty," and would prefer to work on the range with sheep or cattle. *Id.* ¶ 7, JA52. However, in Mr. Castro's experience, ranchers in Washington pay H-2A sheepherders a "very low wage with poor working conditions," and "do not pay a good wage" to U.S. workers like him. *Id.* ¶ 10, JA52; *see* DOL, 2013 Prevailing Wage Rate Correction and Rescission, 78 Fed. Reg. at 19,020 (setting a prevailing wage for sheepherders in Washington of $750 per month plus room and board). After leaving his job as an H-2A sheepherder, Mr. Castro heard about another herder position, but the working conditions "were the same as the ranch [he] left." Castro Decl. ¶ 8, JA52. Mr. Castro instead worked as a farm worker making minimum wage and then at a meatpacking plant earning approximately $12 per hour. *Id.* ¶ 5, JA52.

**C.**     Mr. Velasquez Catalan worked for many years tending sheep and cattle in Chile before coming to the United States in April 2004 to work with cattle on the open range as an H-2A worker. Catalan Decl. ¶¶ 2-3, JA55-56. He left his employment as an H-2A herder because his employer was abusive, held his

documents, prevented him from leaving his housing and surrounding work area, and threatened him with deportation. *Id.* ¶ 4, JA56.

Since leaving his H-2A job, Mr. Velasquez Catalan has become a lawful permanent resident of the United States, and he is authorized to work in the United States. *Id.* ¶ 7, JA56. In that time, he has worked various jobs, "mostly as a farm worker or ranch worker." *Id.* ¶ 5, JA56. He has, for example, worked to harvest grapes and apples and to care for buffalo and sheep. *Id.* In all of these jobs he earned between the minimum hourly wage and approximately $11 per hour. *Id.* In December 2010 he started a new job as a ranch hand working with cattle, where he earns $12.50 per hour. *Id.*

Mr. Velasquez Catalan prefers to work and is available for work on the open range with sheep or cattle. *Id.* ¶ 8, JA56. However, he has "met sheepherders in Washington and they have the same bad conditions that [he] had when [he] worked as an H-2A herder with cattle," including "the same small trailer" and "a low monthly salary." *Id.* ¶ 10, JA57. Because foreign H-2A workers are willing to take jobs even under these poor conditions, "people like [Mr. Velasquez Catalan] cannot find such jobs with decent wages and working conditions." *Id.* ¶ 11, JA57.

20

## III.   The District Court's Decision

The plaintiffs challenged DOL's issuance of the TEGLs without notice-and-comment rulemaking, asserting that the special procedures set forth in the TEGLs injured them by narrowing the herding opportunities available to them at non-depressed wages and working conditions, and by depressing the wages and working conditions of similarly employed U.S. workers. Compl. ¶¶ 5-8, 19, JA8-9, JA11. They sought a declaration that DOL's issuance of the TEGLs violated the APA and an injunction prohibiting DOL from relying on the "special procedures" without first undertaking notice-and-comment rulemaking. *Id.*, Prayer for Relief, JA12.

The district court did not reach the merits of the plaintiffs' claim, instead holding that the plaintiffs lacked both Article III and prudential standing and dismissing the case under Federal Rule of Civil Procedure 12(b)(1). *See generally* Mem. Op., JA62-85. It found that the workers had not established an injury-in-fact because they had not demonstrated that "they are or will likely be competitors in the labor market for open-range herding positions regulated by the challenged guidance." *Id.* at JA78-79. The court emphasized that the workers had not applied for herding positions since DOL adopted the 2011 TEGLs, which—in the court's view—was fatal to a finding of injury-in-fact. *Id.* at JA75. The court also found that the plaintiffs did not demonstrate that "they are or will likely suffer a financial

21

injury as a result of having to compete for open-herding positions at depressed wages and working conditions." *Id.* at JA79. In reaching this conclusion, the court discounted as merely "anecdotal" the plaintiffs' knowledge, experience, and observations regarding job opportunities in the herding industry. *Id.* at JA78. It instead relied heavily on evidence submitted by MPAS that purports to document herding jobs that pay more than $750 per month, the vast majority of which are not located in the states where plaintiffs reside. *Id.* In the district court's view, the fact that some herding jobs exist in the United States at wages above $750 forecloses a finding that the plaintiffs are or will likely suffer financial injury from the TEGLs. *See id.*

The district court separately concluded that the plaintiffs lacked prudential standing because they do "not fall within the zone of interests arguably protected or regulated by the INA." *Id.* at JA84. In the court's view, to have prudential standing, the plaintiffs were required to be "available" for herding jobs or "similarly employed," as those terms are used in § 1188(a) of the INA. *Id.* at JA82-84. It determined that the plaintiffs were not "available" because they were not willing to accept herding positions at the low wages and poor working conditions set by the TEGLs. *Id.* at JA82. The court separately concluded that the plaintiffs were not "similarly employed" U.S. workers, although it did not discuss or even identify the type of employment that plaintiffs currently have, such as Mr.

22

Velasquez Catalan's job as a ranch hand working with cattle. The district court likened plaintiffs' challenge to a scenario in which a mechanic complains of the wages and working conditions provided to street-sweepers, concluding that the plaintiffs had no "proverbial skin in the game." *Id.* at JA83.

## SUMMARY OF ARGUMENT

**I.**   The plaintiffs have Article III standing to challenge DOL's failure to conduct notice-and-comment rulemaking before issuing the TEGLs. They have suffered an injury-in-fact by alleging a procedural violation under the APA and by demonstrating harm to their concrete, particularized interests. Moreover, the injury is fairly traceable to the TEGLS. Specifically, the TEGLs greatly reduce the job opportunities available to U.S. workers in the herding industry, opportunities for which the plaintiffs are qualified, in which they have experience, and which they are interested in obtaining. The TEGLs do so by allowing employers to offer herder jobs at wages and working conditions that are so depressed by the presence of foreign workers that U.S. workers "cannot be expected to accept" them. 20 C.F.R. § 655.0(a)(2). When U.S. workers do not accept the jobs, the TEGLs permit employers to turn to the foreign labor market where workers who are willing to accept substandard working conditions are readily available.

In addition, Mr. Velasquez Catalan has a separate interest harmed by the TEGLs based on his current employment as a ranch hand and corresponding status

23

as a "similarly employed" U.S. worker under the INA. As Congress recognized in enacting 8 U.S.C. § 1188(a), the depressive effects of importing large numbers of foreign workers are not confined to a specific type of job. Rather, such effects spill over, at a minimum, to jobs that constitute "similar[] employ[ment]." *Id.* Ranch workers are competing for the same jobs as herders; indeed, it is frequently difficult to determine whether a worker is working on a ranch or on the range. The TEGLs permit the unlawful addition of foreign workers to the agricultural industry, thus pushing U.S. workers like the plaintiffs toward ranch positions for which similar qualifications and skills are required. Under basic economic theory, such a change in the supply of labor will cause stagnation of ranch hands' wages, if not outright depression. That injury, which is precisely the one that Congress expected DOL to prevent when it adopted 8 U.S.C. § 1188, easily satisfies Article III's requirement for an injury-in-fact.

The plaintiffs also satisfy Article III's redressability requirement. If DOL were ordered to conduct notice-and-comment rulemaking before issuing the "special procedures," the plaintiffs would have an opportunity to make their case that the current procedures violate the INA. DOL might in turn make a different decision as to the appropriate level of wages and working conditions for herder jobs. As this Court has held, such a showing is sufficient to demonstrate redressability under Article III.

24

**II.**   The plaintiffs also have prudential standing to bring their APA claim. The workers are clearly within the zone of interests sought to be protected or regulated under the INA, pursuant to which DOL adopted the TEGLs. The central purpose of the H-2A program and DOL's administration of it is to protect similarly employed U.S. workers from adverse effects on their wages and working conditions caused by the presence of foreign workers and to ensure that U.S. workers have a fair opportunity to apply for agricultural jobs at non-depressed wages and working conditions. *See* 8 U.S.C. § 1188(a)(1); *Snapp*, 458 U.S. at 596. The plaintiffs, who have substantial experience in, qualifications for, and interest in herding work, are "among those [whom] Congress expressly or directly indicated were the intended beneficiaries" of § 1188 of the INA. *Scheduled Airlines Traffic Offices, Inc. v. DOD*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (internal quotation marks and alteration omitted).

**III.**   On the merits, DOL violated the APA by issuing the TEGLs without notice and an opportunity for public comment. The TEGLs exhibit all three hallmarks of rules for which notice-and-comment rulemaking are required. First, the TEGLs are substantive, not procedural, rules because they alter workers' and employers' rights and interests. Second, they are legislative, not interpretive, rules because they provide the basis for DOL actions and effectively amend the H-2A regulations. And third, the TEGLs have a binding effect on employers and

25

employees, and thus do not constitute general statements of policy. The TEGLs are thus of a kind with the general H-2A regulations governing the H-2A labor certification scheme, which DOL has consistently subjected to notice-and-comment rulemaking. That DOL has failed to provide that procedure with respect to the TEGLS is unlawful under the APA and renders the TEGLS invalid.

## STANDING

The facts and legal arguments supporting plaintiffs' standing are discussed in more detail in Parts II and III of the Argument.

## ARGUMENT

### I.    Standard of Review

This Court reviews de novo a district court's decision dismissing a claim under Federal Rule of Civil Procedure 12(b)(1) for lack of standing. *See*, *e.g.*, *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1101 (D.C. Cir. 2005).

### II.   The Plaintiffs Have Article III Standing to Pursue Their APA Challenge.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "[c]ases" and "[c]ontroversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992) (internal quotation marks omitted). A key component of Article III's case-or-controversy requirement is the doctrine of standing, which ensures that a plaintiff has a sufficient "personal stake" in the case "to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493

(2009) (internal quotation marks and emphasis omitted). The doctrine of standing contains three elements: A plaintiff's "injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)).

In a procedural-rights case like this one, Article III's normal standards for immediacy and redressability are relaxed. *See Defenders of Wildlife*, 504 U.S. at 572 n.7; *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012). Specifically, to establish standing, the plaintiffs need not prove that if they "had received the procedure" that was lacking—notice-and-comment rulemaking—"the substantive result would have been altered." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). The Court must instead "assume[] the causal relationship" between DOL's failure to conduct notice-and-comment rulemaking and DOL's choices announced by the TEGLs. *Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). However, the workers must still "demonstrate a causal relationship between the [TEGLs] and the alleged injuries" to their concrete interests. *Id.*; *see Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc).

27

### A.    The Plaintiffs Have Demonstrated That the TEGLs Injure Them in a Concrete and Particularized Way.

The plaintiffs' procedural injury under the APA is straightforward. The plaintiffs allege that DOL failed to engage in notice-and-comment rulemaking, as required by the APA, before issuing the TEGLs. This Court must assume for the purpose of standing that the workers will prevail on the merits of this claim. *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). By failing to provide the requisite notice and an opportunity for public comment, DOL prevented the workers from "mak[ing] [their] case" for wages and working conditions that exceed those set by the TEGLs. *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012). Denial of such a right constitutes a procedural injury for the purpose of Article III.

The plaintiffs have also demonstrated more than the deprivation of a "procedural right *in vacuo*." *Summers*, 555 U.S. at 496. They have shown, as required for Article III standing in a procedural-rights case, that DOL's adoption of the TEGLs without notice-and-comment rulemaking harms their concrete, particularized interests as well.

**1.**    Under the INA, U.S. workers have a statutory right to apply for job opportunities at wages and working conditions not adversely affected by an influx of foreign workers, and to an absolute preference over foreign workers for those positions. 8 U.S.C. § 1188(a); 20 C.F.R. § 655.0(a)(2); *see also Snapp*, 458 U.S. at

28

596. Under the INA's scheme, then, "U.S. workers cannot be expected to accept employment under conditions below [DOL's] established minimum levels" for wages and working conditions, that is, at levels "below which similarly employed U.S. workers would be adversely affected." 20 C.F.R. § 655.0(a)(2).

The plaintiffs are precisely the type of U.S. workers who are intended to benefit from the protections of § 1188(a), and who are not expected to accept positions at wages and working conditions that do not comply with the INA. They are qualified for herding positions and have substantial experience as herders, both in their countries of origin and in the United States. They are also interested in taking herding jobs. But, as their declarations make clear, they are not able to find herding jobs that offer the non-depressed wages and working conditions to which they are entitled by statute, and the TEGLs are the source of this injury. *See* Mendoza Decl. ¶ 11, JA47 (stating that he has "been unable to find [herding] work with decent wages and working conditions" and that "[h]erders in most states are only paid $750 a month and are on call 24 hours a day 7 days a week without any day off or vacation time"); *id.* ¶ 12, JA48 (stating that he has spoken to herders whose employers refuse to provide raises because the law requires them only to pay $750); Catalan Decl. ¶ 10, JA57 (stating that he has "met sheepherders here in Washington and they have the same bad conditions that [he] had when [he] worked as an H-2A herder with cattle," including "the same small trailer" and "low

29

monthly salary"); Castro Decl. ¶ 10, JA52 (stating that ranchers in Washington "do not pay a good wage for someone who has a work permit, like [him]" because they "know that they can hire H-2A sheepherders from South American countries at a very low wage with poor working conditions").

The reduction in the plaintiffs' job opportunities at statutorily-required, non-depressed wages and working conditions constitutes a cognizable injury under Article III. *See Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1379 (9th Cir. 1989) (holding that admission of foreign crewmen to work in the United States caused union members to lose "an opportunity to compete for . . . traditional longshore jobs," resulting in injury-in-fact to establish standing); *Comité de Apoyo a los Trabajadores Agrícolas v. Solis*, No. 09-240, 2010 WL 3431761, at *5 (E.D. Pa. Aug. 30, 2010) (hereinafter, *CATA*) (holding that organization had Article III standing to challenge rule regulating H-2B visa program where member declared "that his family business ha[d] lost contracts and work to employers who use[d] H–2B workers at the wages and conditions available under the new regulations"). *Cf. Snapp*, 458 U.S. at 608 (holding that Puerto Rico had *parens patriae* standing to challenge employers' failure to offer a hiring preference to U.S. workers, in violation of the INA, based on Puerto Rico's interest in protecting its residents from the "deni[al] of access to domestic work opportunities" secured by the INA).

30

This Court has recognized that such "illegal structuring of a competitive environment," including by an agency's decision to "unleash illegal competitors or implement illegal procedures," constitutes an injury-in-fact. *Shays v. FEC*, 414 F.3d 76, 85, 87 (D.C. Cir. 2005). In *Shays v. FEC*, for example, this Court held that congressmen had standing to challenge campaign finance regulations permitting practices that the congressmen argued were prohibited by the Bipartisan Campaign Finance Reform Act (BCRA). The Court concluded that the congressmen "suffer[ed] injury to a statutorily protected interest if under [the agency] rules they must compete for office in contests tainted by BCRA-banned practices." *Id.* at 85. It explained that "regulated litigants suffer legal injury when agencies set the rules of the game in violation of statutory directives." *Id.* Under this standard, the plaintiffs have demonstrated an injury to their legally-protected interest in job opportunities at non-depressed wages.

That the plaintiffs' injury is fairly traceable to the TEGLs, as the workers' declarations indicate, is confirmed by DOL's own findings in adopting the H-2A Final Rule. The TEGLs set the floor for the wages and working conditions that a herding employer must offer to U.S. workers to determine whether any such workers are available to do herding jobs. Only if U.S. workers are unavailable under those wages and working conditions may DOL certify, and an employer hire, H-2A herders. Yet the TEGLs exempt herding employers from offering

31

wages and working conditions otherwise required by the H-2A regulations, even though DOL found, through notice-and-comment rulemaking, that the wages and working conditions in the H-2A regulations are necessary to comply with the INA's labor certification standard. For example, DOL recognized that payment of an AEWR is required to ensure that U.S. agricultural workers "receive the greatest potential protection from adverse effects on their wages and working conditions," in an industry that "can involve large numbers of foreign workers entering a specific labor market." H-2A Final Rule, 75 Fed. Reg. at 6893, 6895. Yet the TEGLs, without explanation or an opportunity for public comment, exempt herding employers from paying an AEWR. Because the TEGLs allow wages and working conditions for herders that are inferior, as measured against DOL's standards for the H-2A program more generally, they violate the plaintiffs' statutory right under the INA by reducing available job opportunities at non-depressed wages and working conditions. The plaintiffs' injury is, therefore, fairly traceable to the TEGLs.

   **2.**      The plaintiffs have also demonstrated an injury-in-fact and causation based on harm to Mr. Velasquez Catalan's interest in avoiding the adverse effects of increased competition from foreign workers. Mr. Velasquez Catalan is "similarly employed" to a herder within the meaning of 8 U.S.C. § 1188(a)(1)(B) because he is a ranch hand working with cattle. Catalan Decl. ¶ 6, JA56. A ranch

hand position and a herding position both involve care of the same types of animals, and both require similar skills and abilities. In fact, the Department of Labor's Occupational Information Network (O*NET) classifies the job titles of "Herdsman" and "Ranch Hand" as part of a single occupation. *See* O-Net Online, Summary Report for Farmworkers, Farm, Ranch, and Aquacultural Animals, Code 45-2093.00, *available at* http://www.onetonline.org/link/summary/45-2093.00; *see also* DOL, Information and Resources, Online Wage Library (revised 2010), *available at* http://www.foreignlaborcert.doleta.gov/wages.cfm (describing O*Net); *see also* Catalan Decl. ¶ 6, JA56 (describing his responsibilities as a ranch hand to include moving cattle to and from different corrals, taking cattle to graze, caring for sick cattle, and tagging and vaccinating cattle). Indeed, for the purpose of the Fair Labor Standards Act (FLSA), which exempts from minimum wage and maximum hour requirements those workers engaged primarily in the open range production of livestock, *see* 29 U.S.C. § 213(a)(6)(E), the difference between a ranch worker such as Mr. Velasquez Catalan and an open range herder may amount to little more than the percentage of time that the worker spends out on the range and how far away from the ranch he is, *see* 29 C.F.R. § 780.327 (defining the job responsibilities of workers engaged in the "production of livestock," regardless whether it occurs on the range); *id.* §§ 780.325-780.326 (defining what constitutes the "range" and "primar[y] engage[ment]" in production of livestock).

33

Because ranch hands and open range production of livestock workers covered by the TEGLs are "similarly employed" under any reasonable definition of the term, Mr. Velasquez Catalan has a concrete interest, secured by § 1188, in ensuring that his current wages and working conditions as a ranch hand are not adversely affected by cheap labor available from foreign workers. The TEGLs harm that concrete interest by permitting increased competition among workers skilled in the care and herding of cattle as a result of the importation of foreign workers into the agricultural industry, including herding, at low wages.

Under the competitor standing doctrine, such a change in competition is sufficient to demonstrate Article III injury-in-fact. That doctrine "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (internal quotation marks omitted); *see also United Transp. Union v. ICC*, 891 F.2d 908, 913 n.7 (D.C. Cir. 1989) (stating that application of "basic economic logic" is "routinely credit[ed]" by courts "in garden-variety competitor standing cases"). And this Court has applied it in numerous cases involving competition in the labor market, including among farmworkers. For example, *International Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985), held that unions and union members demonstrated a concrete Article III injury where they

34

alleged that the Immigration and Naturalization Service allowed "aliens into the country to perform work which would otherwise likely go to union members" and that "those alien workers represent[ed] competition which [the plaintiffs] would not face if the Government followed the procedures required by law." *Id.* at 802; *see also Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1483, 1484 (D.C. Cir. 1994) (holding that union had standing to challenge a rule regulating Mexican drivers' commercial licenses where the union asserted that it would suffer from "extra competition" from Mexican truckers); *AFL-CIO v. Brock*, 835 F.2d at 914, 918 (recognizing in an APA case challenging DOL's wage policy for the H-2A program that a policy of enhancing wages under the program is "to the benefit of all farmworkers" and that, if wages under the program are reduced, U.S. workers who will be recruited at those wages "face possible wage cuts"). *Cf. Feller v. Brock*, 802 F.2d 722, 730 (4th Cir. 1986) (recognizing, in the context of determining the propriety of intervention as of right, that domestic apple pickers would have an interest in the wages paid by a grower in their state, even though they were not employed by the grower, since "[t]heir wages were and are substantially contingent upon the availability of foreign workers to pick for growers in the[] state"). The importation of large numbers of foreign herders will tend to cause stagnation and even wage depression among U.S. workers like Mr. Velasquez Catalan with similar skills and experience. *See* H-2A Final Rule, 75

35

Fed. Reg. at 6895. As a result, Mr. Velasquez Catalan has demonstrated an injury-in-fact as a similarly employed U.S. worker that is caused by the TEGLs.

**3.**     In reaching its determination that the plaintiffs lack an injury-in-fact, the district court made various assumptions or errors that bear correction. First, although the district court relied exclusively on competitor standing cases to analyze the injury to the workers' interests, the plaintiffs are not alleging merely an economic or financial injury in a competitive marketplace. Rather, the plaintiffs' interest as prospective U.S. herders is in access to job opportunities at non-depressed wages and working conditions, job opportunities to which the plaintiffs are statutorily entitled under the INA and for which they should enjoy an absolute preference over foreign workers. *See* 8 U.S.C. § 1188(a); *Snapp*, 458 U.S. at 596. (In this context, the plaintiffs and foreign H-2A workers are not "competitors" in the usual sense because the INA does not permit the importation of foreign workers where U.S. workers are available to fill the positions.) And Mr. Velasquez Catalan, as a similarly employed worker, has a legally-protected interest in not having his wages and working conditions depressed by the importation of foreign labor.

Second, the district court's conclusion that the plaintiffs needed to apply for and quite possibly accept herding jobs under the TEGLs before they could be injured for the purpose of Article III, *see* Mem. Op., JA77, is inconsistent with the

36

rights afforded under the INA. As DOL recognizes, U.S. workers cannot be expected to accept employment under conditions below which similarly employed U.S. workers would be adversely affected. 20 C.F.R. § 655.0(a)(2). Because the plaintiffs contend that the TEGLs set standards that fall below those required by the INA, they suffer a current and continuing injury based on a reduction in their access to job opportunities at statutorily-required standards. It is sufficient for demonstrating such an injury that the plaintiffs are experienced in, qualified for, and interested in herding jobs but cannot accept the jobs at the currently depressed wages and working conditions allowed by the TEGLs. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 184 (2000) (holding that affiants demonstrated a non-speculative injury-in-fact where they stated that they would use an area for recreational activities but for the defendant's discharge of pollutants affecting that site).[7] The plaintiffs were not required to apply for and accept jobs that did not meet standards set by the INA.

---

[7] The plaintiffs here are thus markedly different from those held not to have standing in *Snake River Farmers' Ass'n, Inc. v. DOL*, 9 F.3d 792 (9th Cir. 1993), on which the district court relied, Mem. Op., JA77. In that case, the Ninth Circuit held that U.S. workers were not injured by DOL's approval of certain wage rates and experience requirements in clearance orders for foreign workers that applied to five Idaho counties. *Snake River*, 9 F.3d at 794. The workers had not worked for the farms covered by the orders, and the court made clear that in some instances the workers did not even live in the affected counties. *See id.* at 796-98. In contrast, the plaintiffs here are qualified for and experienced in herding work, and the TEGLs have broad, national application.

37

Third, the district court concluded that the plaintiffs had not demonstrated an injury because they had not shown that their wages and working conditions would be adversely affected by the TEGLs. Mem. Op., JA78. As described above, the district court's decision in this regard cannot be reconciled with the evidence in the record and the economic realities described by DOL in the H-2A Final Rule.

Fourth, the district court erred by placing heavy emphasis on a list of job openings submitted by MPAS, concluding that the availability of such jobs demonstrated that the plaintiffs could find herding positions that pay more than $750 per month. Mem. Op., JA78. The list of jobs is irrelevant under the plaintiffs' theory of standing and, in any event, deserves little weight. The plaintiffs' standing is based on the fact that the TEGLs set minimum wages and working conditions for herders that adversely affect U.S. workers. Those standards are lower than those under the H-2A Final Rule applicable to all other H-2A jobs, and are likely lower than those that DOL would adopt after notice-and-comment rulemaking (because DOL cannot legally establish wages and working conditions that would adversely affect U.S. workers). The plaintiffs' standing thus does not rise or fall with the existence of a few herding jobs that offer wages and working conditions above $750 per month—the DOL-established prevailing wage for sheepherders in most states. *See* DOL, 2013 Prevailing Wage Rate Correction, 78 Fed. Reg. at 19,020.

The relevant inquiry is instead whether the TEGLs permit wages and working conditions that are depressed by the presence of foreign workers, thereby excluding U.S. workers from statutorily-required job opportunities. *Cf. Sugar Cane Growers*, 289 F.3d at 94 (noting that "the relevant question" in determining whether a plaintiff was injured by an agency's failure to conduct notice-and-comment rulemaking to create a payment-in-kind program for sugar farmers was "not whether sugar prices actually went up or down" after the program was implemented "but whether the . . . program had a depressive effect"). If the TEGLs do permit such substandard wages and working conditions, the resulting job opportunities in the herding industry are not available to U.S. workers, and the wages and working conditions of similarly employed U.S. workers, including those of Mr. Velasquez Catalan, are likely to suffer. Both outcomes violate the INA.

In any event, this Court should accord little weight to MPAS's list. MPAS provided no affidavit explaining what the list is, how it was compiled, whether the wages are consistent with or exceed the wages permitted by the TEGLs for each of the states listed, or even whether the jobs are covered by the TEGLs as open range positions. In addition, the jobs identified as paying more than $875 per month are located in Wyoming, California, Texas, and Oregon—states where the plaintiffs do not live.

Moreover, at least when compared to the 2013 prevailing wages set by DOL, most of the jobs appear to pay only the minimum required under the TEGLs for either cattle herders or sheepherders. *Compare* Doc. 34-1, *with* DOL, 2013 Prevailing Wage Rate Correction and Rescission, 78 Fed. Reg. at 19,020.[8] Thus, far from rebutting the workers' evidence with respect to standing, the job list reinforces plaintiffs' point that the TEGL standards have a depressive impact on the wages offered to U.S. workers for positions in the herding industry. Although the TEGLs set a floor for wages and working conditions offered and paid by H-2A employers, in reality, that floor becomes the ceiling because employers need not offer better wages and working conditions to obtain a ready supply of foreign labor.

### B.      The Plaintiffs' Injury Is Capable of Redress by This Court.

The plaintiffs have also demonstrated, as required for Article III standing, that their injuries are likely to be redressed by a favorable judicial decision. *Defenders of Wildlife*, 504 U.S. at 561. As noted above, to satisfy Article III's redressability prong, the plaintiffs do not have to prove that if they "had received

---

[8] DOL did not publish in the Federal Register a notice identifying the state-specific prevailing wages for herders for 2012. However, even if the wage rates offered for jobs in MPAS's exhibit are above those required by the TEGLs for 2012, the exhibit does not indicate, for example, whether the jobs required special skills or experience beyond those for normal herding jobs for which plaintiffs are qualified.

40

the procedure the substantive result would have been altered." *Sugar Cane Growers*, 289 F.3d at 94; *accord Summers*, 555 U.S. at 497. "If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter." *Sugar Cane Growers*, 289 F.3d at 95. "All that is necessary is to show that the procedural step was connected to the substantive result." *Id.* at 94-95.

Here, if the plaintiffs had the opportunity to present their case to DOL, explaining, for example, why the INA requires the agency to raise wages and working conditions offered to herders, the agency might make a different decision. *See*, *e.g.*, *Sierra Club*, 699 F.3d at 533. The plaintiffs thus easily satisfy the relaxed redressability standard in procedural-rights cases. *Peacock*, 682 F.3d at 82. Accordingly, the plaintiffs have Article III standing.

## II.    The Plaintiffs Have Prudential Standing.

Under the APA, 5 U.S.C. § 702, a person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute[] is entitled to judicial review." *Amgen, Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004) (internal quotation marks omitted). To be "adversely affected or aggrieved," a plaintiff's asserted interests "must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012)

41

(internal quotation marks omitted), "or by any provision integrally related to it," *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (internal quotation marks and alterations omitted).

The requirement that a plaintiff have what is termed prudential standing "is not meant to be especially demanding." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987). The test should instead be applied consistent "with Congress's evident intent when enacting the APA" that "agency action [is] presumptively reviewable." *Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210 (internal quotation marks omitted). Indeed, the Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.*; *see, e.g.*, *De Jesus Ramirez v. Reich*, 156 F.3d 1273, 1276 (D.C. Cir. 1998) (holding, despite "some doubts that Congress ever contemplated aliens suing to challenge a denial of a labor certification," that foreign workers on whose behalf employers had petitioned for employment positions had prudential standing to challenge the denial of those petitions). Accordingly, the prudential standing test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210 (internal quotation marks omitted).

The district court erred by holding that the plaintiffs lack prudential standing. The district court appropriately looked to the purpose of 8 U.S.C. § 1188, recognizing that the INA is intended to prevent adverse effects on U.S. workers caused by cheap foreign labor. It nevertheless determined that the plaintiffs were neither "available" for herding jobs, nor "similarly employed," as those terms are used in the INA, and thus not within the zone of interests sought to be protected under the INA.

The court's decision cannot be reconciled with Congress's evident intent in adopting § 1188 of the INA to protect the job opportunities, wages, and working conditions of U.S. workers like the plaintiffs. The plaintiffs are "available" in that they have the skills, experience, and interest to be herders, and, with respect to Mr. Velasquez Catalan, he is "similarly employed" within the meaning of the INA. As direct beneficiaries under the statute, they are plainly within the INA's zone of interests and have prudential standing.

Specifically, the district court's conclusion that the plaintiffs are not "available" under the INA is at odds with the legal meaning of that term. The court considered decisive the fact that the plaintiffs are not willing to accept herding positions at current wages and working conditions. But as the plaintiffs demonstrate (at p.29-30), job opportunities now available to them offer wages and working conditions depressed by the presence of H-2A herders and, therefore,

43

violate the INA. DOL's own regulations make clear that the agency cannot even measure U.S. workers' availability without setting wages and working conditions at levels that do not adversely affect U.S. workers. 20 C.F.R. § 655.0(a)(2). And U.S. workers cannot be expected to accept positions offered at wages and working conditions that would have such an adverse effect. *Id.* Because the plaintiffs are willing, able, and qualified for herding jobs, and are "available" for those jobs at wages and working conditions not adversely affected by foreign workers, they have prudential standing. *See*, *e.g.*, *Int'l Union of Bricklayers & Allied Craftsmen*, 761 F.2d at 799, 804-05 (holding that unions and union members had prudential standing to challenge the use of certain guidelines that resulted in an influx of foreign workers under the predecessor H-2 program and a loss of domestic employment opportunities).

The district court relied exclusively for its contrary holding on *Hernandez Flecha v. Quiros*, 567 F.2d 1154 (1st Cir. 1977), *see* Mem. Op., JA82, but that case is inapposite. In *Hernandez Flecha*, Puerto Rican workers sought a job preference for migrant agricultural work at wages and working conditions *above* those that were set by DOL and that were sufficient to avoid an adverse effect on U.S. workers. The First Circuit held that workers who sought more than the minimum, non-depressed terms required by law were not "available" domestic workers, as that term is used in the INA. *Hernandez Flecha*, 567 F.2d at 1156-57. In contrast,

44

the plaintiffs here seek access to job opportunities at wages and working conditions that are required by the INA—that is, that do not adversely affect U.S. workers. The plaintiffs are statutorily entitled to such opportunities and would be "available" for them based on their interest, experience, and qualifications. Their availability is sufficient to bring the plaintiffs within the zone of interests sought to be protected by the INA, thus establishing prudential standing.

The district court also erred by concluding that none of the plaintiffs was "similarly employed" within the meaning of the INA. Mr. Velasquez Catalan's position as a ranch hand working with cattle constitutes similar employment to herding. *See* discussion, *supra*, at p.32-33. The district court did not compare the characteristics of a ranch hand and a cattle herding position. As a result, it offered no basis for its comment that Mr. Velasquez Catalan could be compared to a mechanic complaining about the wages and working conditions of a street-sweeper. The district court's analogy is inapplicable, and its corresponding holding is wrong.

Because plaintiffs are "available," and Mr. Velasquez Catalan is "similarly employed," as those terms are used in the INA, the plaintiffs are "among those [whom] Congress expressly or directly indicated were the intended beneficiaries" in adopting § 1188(a) of the INA. *Scheduled Airlines Traffic Offices*, 87 F.3d at 1359. At a minimum, it can hardly be said that the plaintiffs' interest in access to

45

job opportunities at non-depressed wages and working conditions and Mr. Velasquez Catalan's interest in avoiding wage depression caused by foreign herders are only "marginally related to" § 1188's goal of protecting the American workforce from an abundance of cheap, foreign labor. *Match-E-Be-Nash-She-Wish*, 132 S. Ct. at 2210 (internal quotation marks omitted). Accordingly, the workers have prudential standing.

## IV.  DOL Violated the APA by Issuing the TEGLs Without Notice and an Opportunity for Comment.

Although the district court did not reach the merits of the APA claim, the parties fully briefed the issue on cross-motions for summary judgment. Because the plaintiffs have both Article III and prudential standing, this Court should decide the merits on appeal. The agency record before this Court is "just as it would be before the district court on remand," and the district court has no "comparative advantage" in determining whether DOL's action violated the APA's notice-and-comment requirement. *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.* (fourth footnote) (D.C. Cir. 2012). The plaintiffs also anticipate that any resolution of this issue on remand may well lead to a second appeal, which further supports resolution of the issue at this time. *See id.*

Agency rules are generally subject to the APA's requirement of notice-and-comment rulemaking. 5 U.S.C. § 553. Pursuant to that requirement, before issuing a final rule, an agency must first give notice to the public of a proposed rule

through publication in the Federal Register. *Id.* § 553(b). The agency must then "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

In this case, the plaintiffs and DOL agree that the agency issued the TEGLs without notice or opportunity for public comment, *see* Compl. ¶ 18, JA11; Doc. 10, Federal Defs.' Answer ¶ 18, JA16, as is generally required under the APA. Moreover, each TEGL clearly constitutes a "rule." 5 U.S.C. § 551(4). The only issue then is whether the TEGLs constitute legislative rules subject to the APA's notice-and-comment rulemaking requirement,[9] or whether they instead fit into the APA's exception for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," that can be issued without notice and an opportunity for comment. *Id.* § 553(b); *see also EPIC*, 653 F.3d at 5.

None of the APA's exceptions to the notice-and-comment requirement applies to the TEGLs. Rather, the TEGLs exhibit all three hallmarks of rules for which notice and an opportunity for public comment are required: the TEGLs alter

---

[9] This Court has used the terms "legislative rule" and "substantive rule" in overlapping ways. It has used the term "legislative rule" in a general sense to refer to rules that do not fall into any of § 553's exceptions, *see Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 11 (D.C. Cir. 2011) (hereinafter, *EPIC*); *Sierra Club*, 699 F.3d at 535, and in a narrow sense to refer to rules that do not fall into the APA's specific exception for "interpretative" rules, *EPIC*, 653 F.3d at 6. It has used the term "substantive rule" to refer to rules that do not fall into the APA's separate exception for rules of "agency organization, procedure or practice," i.e., procedural rules. *Id.* at 5. The workers adopt the same terminology here.

workers' and employers' rights and interests; they provide the basis for DOL actions and effectively amend the H-2A regulations; and they have a binding effect on employers and employees. Because the TEGLs were issued without notice-and-comment rulemaking, they are invalid.

### A.    Because The TEGLs Alter Workers' and Employers' Rights and Interests, They Are Not Procedural Rules.

A rule that does not fit within the APA's exception for procedural rules, 5 U.S.C. § 553, and is thus otherwise subject to notice-and-comment rulemaking, is a substantive rule. *See EPIC*, 653 F.3d at 5. The touchstone of a substantive rule is that it "alter[s] the rights or interests of parties." *Id.* (internal quotation marks omitted); *accord Batterton v. Marshall*, 648 F.2d 694, 708 (D.C. Cir. 1980).

Here, the TEGLs set material terms of employment, such as wages and housing benefits. Those terms constitute substantive law by delineating the promises that employers can make to recruit U.S. and H-2A workers and the corresponding protections afforded to herders. For example, while H-2A regulations require an employer to agree to pay and advertise an AEWR if it exceeds the prevailing wage, the TEGLs contain no such requirement.

The TEGLs, therefore, do not constitute a rule of agency organization, procedure, or practice, known generally as a procedural rule, which "is primarily directed toward improving the efficient and effective operations of an agency." *Id.* at 702 n.34. Although a procedural rule "may alter the manner in which the parties

48

present themselves or their viewpoints to the agency," it cannot "impose new substantive burdens." *EPIC*, 653 F.3d at 5 (internal quotation marks omitted); *see also JEM Broad. Co., Inc. v. FCC*, 22 F.3d 320, 327 (D.C. Cir. 1994) (holding in the alternative that rules "depriv[ing] [broadcasting] license applicants of the opportunity to correct errors or defects in their filings" were procedural but emphasizing that the rules "did not change the substantive standards by which the FCC evaluate[d] license applications, e.g., financial qualifications, proposed programming, and transmitter location" (emphasis omitted)). The TEGLs go far beyond this kind of "agency housekeeping rule[]." *Id.* at 328. The substantive effects of the TEGLs at issue—described in the workers' declarations—are "sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *EPIC*, 653 F.3d at 5-6 (internal quotation marks omitted).

B.     **Because The TEGLs Provide the Basis for DOL Actions and Effectively Amend the H-2A Regulations, They Are Not Interpretive Rules.**

To determine whether a rule falls into the APA's exception for interpretive rules or is instead what is termed a legislative rule, the key question "is whether the new rule effects 'a substantive regulatory change' to the statutory or regulatory regime." *Id.* at 6-7 (quoting *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34-40 (D.C. Cir. 2005)). If the rule spawns this kind of change, it is legislative. If it instead "clarifies a statutory term" or "reminds parties of existing statutory duties," it is

interpretive. *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992).

Under this Court's test in *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106 (D.C. Cir. 1993), a rule effects a substantive regulatory change and is, therefore, legislative if "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties," or if "the rule effectively amends a prior legislative rule." *Id.* at 1112. The TEGLs meet both criteria.

*1.    **The TEGLs serve as the legislative basis for agency action.*** The TEGLs provide a basis for enforcement actions or agency decisions conferring benefits or ensuring the performance of duties, so they are legislative rules. *Id.* For example, the TEGLs supply the only source of law to regulate range housing. The TEGLs, like legislative rules, thus fill a regulatory void. *See Chamber of Commerce v. OSHA*, 636 F.2d 464, 465, 469 (D.C. Cir. 1980) (holding that agency's rule "declaring per se discriminatory the failure of an employer to compensate an employee representative for his walkaround time" with a safety inspector was legislative because the statute under which the rule was issued "neither prohibit[ed] nor compel[led] pay for walkaround time").

50

Likewise, the TEGLs provide the only basis on which DOL may certify herder jobs if an employer does not agree to pay the highest of the AEWR, prevailing hourly wage, prevailing piece rate, collective bargaining rate, or federal or state minimum wage. In the absence of the TEGLs, the H-2A regulations would require the rejection of such an employer's petition in these circumstances. The TEGLs thus provide the legislative basis for agency approval of labor certification applications.

Two cases have considered the question whether DOL-imposed obligations on employers very similar to those at issue here are legislative rules. Both answered in the affirmative, focusing on the fact that the rules create standards not established by the applicable statute and regulations. In *CATA*, 2010 WL 3431761 (E.D. Pa. Aug. 30, 2010), a district court considered a challenge to DOL regulations, issued through notice-and-comment rulemaking, that governed the H-2B visa program. *Id.* at *3. A companion to the H-2A program, the H-2B program is for non-agricultural guestworkers. The challenged H-2B regulations authorized the use of skill levels to make prevailing wage determinations for H-2B workers, but in practice, the agency used a methodology set forth in guidance letters issued without notice and an opportunity for comment to determine the "skill level" wages. *Id.* at *18. The court determined that the wage methodology adopted in the guidance letters was not an interpretive rule because it did not interpret any

51

statutory or regulatory provision. To the contrary, the methodology was "entirely untethered from any other statutory or regulatory provisions, and . . . affirmatively create[d] the wages paid to H-2B workers." *Id.* at *19. The court thus held that the guidance letters constituted legislative rules that were invalid without notice-and-comment rulemaking. *Id.*

Like the guidance letters at issue in *CATA*, the TEGLs in this case do not interpret anything; they are "entirely untethered" from the statutory provision authorizing the H-2A program and the regulations implementing it. If, as *CATA* determined, the methodology for determining a non-agricultural worker's wage requires notice and an opportunity for public comment, then surely DOL's decision regarding the method for calculating wages offered to herders must be subject to notice-and-comment rulemaking as well.

Similarly, in *National Ass'n of Manufacturers v. DOL*, No. 95-0715, 1996 WL 420868 (D.D.C. July 22, 1996), a district court in this Circuit held that rules similar to those at issue here, but governing the H-1B visa program for certain non-immigrants in specialty occupations, were legislative. The court considered DOL's rule requiring employers to "compensate H-1B employees for hours not worked" and permitting DOL "to require full time compensation if [DOL] observed during a brief period that a part-time employee was working more than the hours listed" in a labor application. *Id.* at *13. It concluded that these "provisions create[d] duties

not previously required" and so could not "credibly be considered . . . mere interpretations of prior rules." *Id.* The court also deemed legislative a rule that employers "must have and document an objective system used to determine the wages of non-H-1B workers, and apply that system to H-1B non-immigrants." *Id.* at *14 (internal quotation marks omitted). The court rejected DOL's argument that this rule was a "mere interpretation of the statutory directive that the actual wage of H-1B employees must be equal to their non-H-1B colleagues." *Id.* If requiring employers to compensate employees for hours not worked is a legislative rule, then certainly permitting employers not to pay employees for hours worked, or to pay them at lower rates than otherwise applicable regulations would require, is as well.

   2.   *The TEGLs effectively amend the H-2A regulations.* Under this Court's test in *American Mining Congress*, the TEGLs also constitute legislative rules because they effectively amend the H-2A regulations, carving out sheepherders and open range livestock workers for different and less favorable treatment than they would otherwise receive under the H-2A regulations. *See* Open Range TEGL, JA32 ("Unless otherwise specified in [the TEGL], applications submitted for these occupations must comply with the requirements for processing H-2A applications contained [in the H-2A regulations]."); Sheepherding TEGL, JA38 (same). For example, in the absence of the TEGLs, H-2A participating employers would be obligated to offer and pay an AEWR to U.S. and H-2A

53

herders, keep track of workers' hours, and pay workers at least twice a month. But under the TEGLs, employers need not do any of those things.

This aspect of the TEGLs further demonstrates their legislative character, because a rule "cannot be interpretative if the regulatory framework it purports to interpret would yield the opposite result." *Steinhorst Assoc. v. Preston*, 572 F. Supp. 2d 112, 121 (D.D.C. 2008); *see also City of Idaho Falls v. FERC*, 629 F.3d 222, 227-29, 231 (D.C. Cir. 2011) (holding that an agency's use of an updated fee schedule to set rental fees charged to hydropower licensees was a legislative amendment to an earlier rule because the amendment used a methodology rejected by the earlier regulation); *Nat'l Family Planning*, 979 F.2d at 235 (stating that an agency's "subsequent interpretation run[ning] 180 degrees counter to the plain meaning of [a] regulation gives us at least some cause to believe that the agency may be seeking to constructively amend the regulation"); *AFL-CIO v. Chao*, 227 F. Supp. 2d 102, 110 (D.D.C. 2002) (holding that DOL could not adopt without notice-and-comment rulemaking a policy that precluded payment of an AEWR equivalent to current USDA wage rates because the policy was contrary to existing H-2A regulations).

The fact that the H-2A regulations, 20 C.F.R. § 655.102, purport to grant the agency authority to create "special procedures" does not mean that the TEGLs merely interpret, rather than amend, the H-2A regulations. An agency may not

"grant itself a valid exemption to the APA for all future regulations, and be free of APA's troublesome rulemaking procedures forever after, simply by announcing its independence in a general rule." *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989) (holding that regulation permitting agency to adopt additional conditions and time limits on demonstrations in national parks did not release the agency from its obligation to conduct notice-and-comment rulemaking for a "condition" that was a legislative, not interpretive, rule). Accordingly, 20 C.F.R. § 655.102 cannot excuse DOL's failure to conduct notice-and-comment rulemaking here.

### C.   Because The TEGLs Have a Binding Effect on the Parties, They Do Not Constitute a Statement of General Policy.

The TEGLs "present[] the course [that DOL] has selected and followed," so they do not fall within the APA's exception for a statement of general policy. *Batterton*, 648 F.2d at 706. Rather, the TEGLs represent DOL's official course, and they have "present binding effect." *EPIC*, 653 F.3d at 7 (internal quotation marks omitted). The TEGLs speak in terms of what employers must do to receive labor certification, and they limit the agency's ability to certify requests for H-2A workers if employers do not comply. For notice-and-comment rulemaking otherwise to apply, "it is enough for the [TEGLs] . . . to be cast in mandatory language so the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *Id.* (internal quotation marks omitted)

55

(holding that agency's procedures for screening airport passengers was binding, and therefore not a general statement of policy, where "a passenger is bound to comply with whatever screening procedure the [agency] is using on the date he is to fly at the airport from which his flight departs"). Such is the case here, so the APA's exception for "general statements of policy" does not apply, and the TEGLs are subject to notice-and-comment rulemaking.

### D.     DOL's Failure to Conduct Notice-and-Comment Rulemaking Is Prejudicial.

Although this Court should take "due account . . . of the rule of prejudicial error" when reviewing the plaintiffs' APA claim, 5 U.S.C. § 706, DOL's "utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure," *Sugar Cane Growers*, 289 F.3d at 96. Under these circumstances, the plaintiffs need not "indicate[] additional considerations they would have raised in a comment procedure." *Id.* at 97. Nor must they show actual prejudice. *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003); *see also McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C. Cir. 1988).

The plaintiffs easily meet this low bar. If the TEGLs were subject to notice-and-comment rulemaking, the plaintiffs would have a formal opportunity to comment on the TEGLs' contents. DOL would have to explain on the record why it exempts herders from protective standards applicable to other agricultural

56

workers. DOL would also have to grapple with its conclusion that payment of an AEWR, which "avoids adverse effects on currently employed workers by preventing wages from stagnating at the local prevailing wage rate," H-2A Final Rule, 75 Fed. Reg. at 6891-92, is unnecessary to ensure that the importation of H-2A herders does "not adversely affect the wages and working conditions of workers in the United States similarly employed," 8 U.S.C. § 1188(a)(1)(B). In the absence of this kind of administrative reckoning, DOL's failure to engage in notice-and-comment rulemaking is surely not harmless.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order dismissing the plaintiffs' claim for lack of standing, hold that DOL's issuance of the TEGLs without notice and an opportunity for public comment violated the APA, and remand to the district court for determination of an appropriate remedy.

Dated: August 22, 2013                      Respectfully submitted,

                                            /s/ Julie A. Murray
P. Alex McBean                              Julie A. Murray
Utah Legal Services, Inc.                   Michael T. Kirkpatrick
205 North 400 West                          PUBLIC CITIZEN LITIGATION GROUP
Salt Lake City, UT 84103                    1600 20th Street NW
(801) 328-8891                              Washington, DC 20009
                                            (202) 588-1000
Jennifer J. Lee                            jmurray@citizen.org
Migrant Farm Worker Division
Colorado Legal Services                     Edward Tuddenham
1905 Sherman Street, Suite 400              228 W. 137th Street
Denver, CO 80203                            New York, NY 10030
(303) 866-9366                              (212) 234-5953

*Of Counsel*                                *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-face and volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) as follows: The type face is fourteen-point Times New Roman font, and the word count is 13,371.

/s/ Julie A. Murray
Julie A. Murray

## CERTIFICATE OF SERVICE

I certify that on August 22, 2013, I caused the foregoing to be filed with the Clerk of the Court through the Court's ECF system, which will serve notice of the filing on all filers registered in this case.

/s/ Julie A. Murray
Julie A. Murray

# ADDENDUM OF STATUTES AND REGULATIONS

## TABLE OF CONTENTS

Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.* ................................... A-2
    8 U.S.C. § 1101, Definitions ..................................................... A-2
    8 U.S.C. § 1188, Admission of temporary H-2A workers ........................ A-2

20 C.F.R. Part 655,
Temporary Employment of Foreign Workers in the United States ...................... A-5
    20 C.F.R. § 655.0, Scope and purpose of part ........................................... A-5

20 C.F.R. Part 655, Subpart B,
Labor Certification Process for Temporary Agricultural Employment
in the United States ........................................................................................ A-7
    20 C.F.R. § 655.100, Scope and purpose of subpart B ............................. A-7
    20 C.F.R. § 655.102, Special procedures .................................................. A-7
    20 C.F.R. § 655.103, Overview of this subpart and definition of terms .... A-8
    20 C.F.R. § 655.120, Offered wage rate ................................................... A-9
    20 C.F.R. § 655.122, Contents of job offers ............................................. A-9
    20 C.F.R. § 655.130, Application filing requirements ............................ A-11
    20 C.F.R. § 655.135, Assurances and obligations of H-2A employers ... A-12
    20 C.F.R. § 655.143, Notice of acceptance ............................................ A-13
    20 C.F.R. § 655.158, Duration of positive recruitment ........................... A-13
    20 C.F.R. § 655.161, Criteria for certification ....................................... A-14

**Immigration and Nationality Act, 8 U.S.C. § 1101,** *et seq.*

## 8 U.S.C. § 1101, Definitions

(a) As used in this chapter

> (15) The term 'immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens –

> . . .

>> (H) an alien . . . (ii)(a) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature . . . .

## 8 U.S.C. § 1188, Admission of temporary H-2A workers

(a) Conditions for approval of H-2A petitions

> (1) A petition to import an alien as an H-2A worker (as defined in subsection (i)(2) of this section) may not be approved by the Attorney General unless the petitioner has applied to the Secretary of Labor for a certification that –

>> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

>> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

(b) Conditions for denial of labor certification

> The Secretary of Labor may not issue a certification under subsection (a) of this section with respect to an employer if the conditions described in that subsection are not met or if any of the following conditions are met:

A-2

. . .

(4) The Secretary determines that the employer has not made positive recruitment efforts within a multi-state region of traditional or expected labor supply where the Secretary finds that there are a significant number of qualified United States workers who, if recruited, would be willing to make themselves available for work at the time and place needed. Positive recruitment under this paragraph is in addition to, and shall be conducted within the same time period as, the circulation through the interstate employment service system of the employer's job offer. The obligation to engage in positive recruitment under this paragraph shall terminate on the date the H-2A workers depart for the employer's place of employment.

. . .

(c) Special rules for consideration of applications

The following rules shall apply in the case of the filing and consideration of an application for a labor certification under this section:

. . .

(3) Issuance of certification

(A) The Secretary of Labor shall make, not later than 30 days before the date such labor or services are first required to be performed, the certification described in subsection (a)(1) of this section if –

(i) the employer has complied with the criteria for certification (including criteria for the recruitment of eligible individuals as prescribed by the Secretary), and

(ii) the employer does not actually have, or has not been provided with referrals of, qualified eligible individuals who have indicated their availability to perform such labor or services on the terms and conditions of a job offer which meets the requirements of the Secretary.

A-3

In considering the question of whether a specific qualification is appropriate in a job offer, the Secretary shall apply the normal and accepted qualifications required by non-H-2A-employers in the same or comparable occupations and crops.

(4) Housing

Employers shall furnish housing in accordance with regulations. The employer shall be permitted at the employer's option to provide housing meeting applicable Federal standards for temporary labor camps or to secure housing which meets the local standards for rental and/or public accommodations or other substantially similar class of habitation: *Provided,* That in the absence of applicable local standards, State standards for rental and/or public accommodations or other substantially similar class of habitation shall be met: *Provided further,* That in the absence of applicable local or State standards, Federal temporary labor camp standards shall apply: *Provided further,* That the Secretary of Labor shall issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock: *Provided further,* That when it is the prevailing practice in the area and occupation of intended employment to provide family housing, family housing shall be provided to workers with families who request it: *And provided further,* That nothing in this paragraph shall require an employer to provide or secure housing for workers who are not entitled to it under the temporary labor certification regulations in effect on June 1, 1986. The determination as to whether the housing furnished by an employer for an H-2A worker meets the requirements imposed by this paragraph must be made prior to the date specified in paragraph (3)(A) by which the Secretary of Labor is required to make a certification described in subsection (a)(1) of this section with respect to a petition for the importation of such worker.

**20 C.F.R. Part 655,**
**Temporary Employment of Foreign Workers in the United States**

## 20 C.F.R. 655.0, Scope and purpose of part

(a) Subparts A, B, and C –

(1) General. Subparts A, B, and C of this part set out the procedures adopted by the Secretary to secure information sufficient to make factual determinations of: (i) Whether U.S. workers are available to perform temporary employment in the United States, for which an employer desires to employ nonimmigrant foreign workers, and (ii) whether the employment of aliens for such temporary work will adversely affect the wages or working conditions of similarly employed U.S. workers. These factual determinations (or a determination that there are not sufficient facts to make one or both of these determinations) are required to carry out the policies of the Immigration and Nationality Act (INA), that a nonimmigrant alien worker not be admitted to fill a particular temporary job opportunity unless no qualified U.S. worker is available to fill the job opportunity, and unless the employment of the foreign worker in the job opportunity will not adversely affect the wages or working conditions of similarly employed U.S. workers.

(2) The Secretary's determinations. Before any factual determination can be made concerning the availability of U.S. workers to perform particular job opportunities, two steps must be taken. First, the minimum level of wages, terms, benefits, and conditions for the particular job opportunities, below which similarly employed U.S. workers would be adversely affected, must be established. (The regulations in this part establish such minimum levels for wages, terms, benefits, and conditions of employment.) Second, the wages, terms, benefits, and conditions offered and afforded to the aliens must be compared to the established minimum levels. If it is concluded that adverse effect would result, the ultimate determination of availability within the meaning of the INA cannot be made since U.S. workers cannot be expected to accept employment under conditions below the established minimum levels. *Florida Sugar Cane League, Inc. v. Usery*, 531 F. 2d 299 (5th Cir. 1976).

Once a determination of no adverse effect has been made, the availability of U.S. workers can be tested only if U.S. workers are actively recruited

through the offer of wages, terms, benefits, and conditions at least at the minimum level or the level offered to the aliens, whichever is higher. The regulations in this part set forth requirements for recruiting U.S. workers in accordance with this principle.

(3) Construction. This part and its subparts shall be construed to effectuate the purpose of the INA that U.S. workers rather than aliens be employed wherever possible. *Elton Orchards, Inc. v. Brennan*, 508 F. 2d 493, 500 (1st Cir. 1974), *Flecha v. Quiros*, 567 F. 2d 1154 (1st Cir. 1977). Where temporary alien workers are admitted, the terms and conditions of their employment must not result in a lowering of the terms and conditions of domestic workers similarly employed, *Williams v. Usery*, 531 F. 2d 305 (5th Cir. 1976); *Florida Sugar Cane League, Inc. v. Usery*, 531 F. 2d 299 (5th Cir. 1976), and the job benefits extended to any U.S. workers shall be at least those extended to the alien workers.

. . . .

## 20 C.F.R. Part 655, Subpart B,
## Labor Certification Process for Temporary Agricultural
## Employment in the United States

### 20 C.F.R. § 655.100, Scope and purpose of subpart B.

This subpart sets out the procedures established by the Secretary of the United States Department of Labor (the Secretary) under the authority given in 8 U.S.C. 1188 to acquire information sufficient to make factual determinations of:

> (a) Whether there are sufficient able, willing, and qualified United States (U.S.) workers available to perform the temporary and seasonal agricultural employment for which an employer desires to import nonimmigrant foreign workers (H-2Aworkers); and

> (b) Whether the employment of H-2Aworkers will adversely affect the wages and working conditions of workers in the U.S. similarly employed.

### 20 C.F.R. § 655.102, Special procedures.

To provide for a limited degree of flexibility in carrying out the Secretary's responsibilities under the Immigration and Nationality Act (INA), while not deviating from statutory requirements, the OFLC Administrator has the authority to establish, continue, revise, or revoke special procedures for processing certain H-2Aapplications. Employers must demonstrate upon written application to the OFLC Administrator that special procedures are necessary. These include special procedures currently in effect for the handling of applications for sheepherders in the Western States (and adaptation of such procedures to occupations in the range production of other livestock), and for custom combine harvesting crews. Similarly, for work in occupations characterized by other than a reasonably regular workday or workweek, such as the range production of sheep or other livestock, the OFLC Administrator has the authority to establish monthly, weekly, or semi-monthly adverse effect wage rates (AEWR) for those occupations for a statewide or other geographical area. Prior to making determinations under this section, the OFLC Administrator may consult with affected employer and worker representatives. Special Procedures in place on the effective date of this regulation will remain in force until modified by the Administrator.

**20 C.F.R. § 655.103, Overview of this subpart and definition of terms.**

(a) Overview. In order to bring nonimmigrant workers to the U.S. to perform agricultural work, an employer must first demonstrate to the Secretary that there are not sufficient U.S. workers able, willing, and qualified to perform the work in the area of intended employment at the time needed and that the employment of foreign workers will not adversely affect the wages and working conditions of U.S. workers similarly employed. This rule describes a process by which the Department of Labor (Department or DOL) makes such a determination and certifies its determination to the Department of Homeland Security (DHS).

(b) Definitions. For the purposes of this subpart:

. . .

Adverse effect wage rate (AEWR). The annual weighted average hourly wage for field and livestock workers (combined) in the States or regions as published annually by the U.S. Department of Agriculture (USDA) based on its quarterly wage survey.

. . .

Positive recruitment. The active participation of an employer or its authorized hiring agent, performed under the auspices and direction of the OFLC, in recruiting and interviewing individuals in the area where the employer's job opportunity is located and any other State designated by the Secretary as an area of traditional or expected labor supply with respect to the area where the employer's job opportunity is located, in an effort to fill specific job openings with U.S. workers.

. . .

United States worker (U.S. worker). A worker who is:

    (1) A citizen or national of the U.S.; or

    (2) An alien who is lawfully admitted for permanent residence in the U.S., is admitted as a refugee under 8 U.S.C. 1157, is granted asylum under 8 U.S.C. 1158, or is an immigrant otherwise authorized (by the INA or by DHS) to be employed in the U.S.; or

(3) An individual who is not an unauthorized alien (as defined in 8 U.S.C. 1324a(h)(3)) with respect to the employment in which the worker is engaging.

. . . .

**20 C.F.R. § 655.120, Offered wage rate.**

(a) To comply with its obligation under § 655.122(l), an employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, except where a special procedure is approved for an occupation or specific class of agricultural employment.

(b) If the prevailing hourly wage rate or piece rate is adjusted during a work contract, and is higher than the highest of the AEWR, the prevailing wage, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, in effect at the time the work is performed, the employer must pay that higher prevailing wage or piece rate, upon notice to the employer by the Department.

(c) The OFLC Administrator will publish, at least once in each calendar year, on a date to be determined by the OFLC Administrator, the AEWRs for each State as a notice in the Federal Register.

**20 C.F.R. § 655.122, Contents of job offers.**

. . .

(c) Minimum benefits, wages, and working conditions. Every job order accompanying an Application for Temporary Employment Certification must include each of the minimum benefit, wage, and working condition provisions listed in paragraphs (d) through (q) of this section.

(d) Housing.

    (1) Obligation to provide housing. The employer must provide housing at no cost to the H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day. Housing must be provided through one of the following means:

(i) Employer-provided housing. Employer-provided housing must meet the full set of DOL Occupational Safety and Health Administration (OSHA) standards set forth at 29 CFR 1910.142, or the full set of standards at §§ 654.404 through 654.417 of this chapter, whichever are applicable under § 654.401 of this chapter. Requests by employers whose housing does not meet the applicable standards for conditional access to the interstate clearance system, will be processed under the procedures set forth at § 654.403 of this chapter; or

(ii) Rental and/or public accommodations. Rental or public accommodations or other substantially similar class of habitation must meet local standards for such housing. In the absence of applicable local standards, State standards will apply. In the absence of applicable local or State standards, DOL OSHA standards at 29 CFR 1910.142 will apply. Any charges for rental housing must be paid directly by the employer to the owner or operator of the housing. The employer must document to the satisfaction of the CO that the housing complies with the local, State, or Federal housing standards.

(2) Standards for range housing. Housing for workers principally engaged in the range production of livestock must meet standards of DOL OSHA for such housing. In the absence of such standards, range housing for sheepherders and other workers engaged in the range production of livestock must meet guidelines issued by OFLC.

. . .

(j) Earnings records.

(1) The employer must keep accurate and adequate records with respect to the workers' earnings, including but not limited to field tally records, supporting summary payroll records, and records showing the nature and amount of the work performed; the number of hours of work offered each day by the employer (broken out by hours offered both in accordance with and over and above the three-fourths guarantee at paragraph (i)(3) of this section); the hours actually worked each day by the worker; the time the worker began and ended each workday; the rate of pay (both piece rate and hourly, if applicable); the worker's earnings per pay period; the worker's home address; and the amount of and reasons for any and all deductions taken from the worker's wages.

A-10

. . .

(4) The employer must retain the records for not less than 3 years after the date of the certification.

. . .

(l) Rates of pay. If the worker is paid by the hour, the employer must pay the worker at least the AEWR, the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period.

(1) The offered wage may not be based on commission, bonuses, or other incentives, unless the employer guarantees a wage paid on a weekly, semi-monthly, or monthly basis that equals or exceeds the AEWR, prevailing hourly wage or piece rate, the legal Federal or State minimum wage, or any agreed-upon collective bargaining rate, whichever is highest; or

. . .

(m) Frequency of pay. The employer must state in the job offer the frequency with which the worker will be paid, which must be at least twice monthly or according to the prevailing practice in the area of intended employment, whichever is more frequent. Employers must pay wages when due.

. . . .

**20 C.F.R. § 655.130, Application filing requirements.**

All agricultural employers who desire to hire H-2Aforeign agricultural workers must apply for a certification from the Secretary by filing an Application for Temporary Employment Certification with the NPC designated by the OFLC Administrator. The following section provides the procedures employers must follow when filing.

(a) What to file. An employer, whether individual, association, or an H–2ALC, that desires to apply for temporary employment certification of one or more nonimmigrant foreign workers must file a completed Application for Temporary Employment Certification form and, unless a specific exemption applies, a copy of

Form ETA–790, submitted to the SWA serving the area of intended employment, as set forth in § 655.121(a).

. . .

**20 C.F.R. § 655.135, Assurances and obligations of H-2Aemployers.**

An employer seeking to employ H-2Aworkers must agree as part of the Application for Temporary Employment Certification and job offer that it will abide by the requirements of this subpart and make each of the following additional assurances:

. . .

(c) Recruitment requirements. The employer has and will continue to cooperate with the SWA by accepting referrals of all eligible U.S. workers who apply (or on whose behalf an Application for Temporary Employment Certification is made) for the job opportunity until the end of the period as specified in paragraph (d) of this section and must independently conduct the positive recruitment activities, as specified in § 655.154, until the date on which the H-2Aworkers depart for the place of work. Unless the SWA is informed in writing of a different date, the date that is the third day preceding the employer's first date of need will be determined to be the date the H-2Aworkers departed for the employer's place of business.

(d) Fifty percent rule. From the time the foreign workers depart for the employer's place of employment, the employer must provide employment to any qualified, eligible U.S. worker who applies to the employer until 50 percent of the period of the work contract has elapsed. Start of the work contract timeline is calculated from the first date of need stated on the Application for Temporary Employment Certification, under which the foreign worker who is in the job was hired. This provision will not apply to any employer who certifies to the CO in the Application for Temporary Employment Certification that the employer:

> (1) Did not, during any calendar quarter during the preceding calendar year, use more than 500 man-days of agricultural labor, as defined in sec. 203(u) of Title 29;

> (2) Is not a member of an association which has petitioned for certification under this subpart for its members; and

(3) Has not otherwise associated with other employers who are petitioning for temporary foreign workers under this subpart.

. . .

## 20 C.F.R. § 655.143, Notice of acceptance.

(a) Notification timeline. When the CO determines the Application for Temporary Employment Certification and job order are complete and meet the requirements set forth in this subpart, the CO will notify the employer within 7 calendar days of the CO's receipt of the Application for Temporary Employment Certification. A copy will be sent to the SWA serving the area of intended employment.

(b) Notice content. The notice must:

> (1) Authorize conditional access to the interstate clearance system and direct the SWA to circulate a copy of the job order to other such States the CO determines to be potential sources of U.S. workers;

> (2) Direct the employer to engage in positive recruitment of U.S. workers in a manner consistent with § 655.154 and to submit a report of its positive recruitment efforts as specified in § 655.156;

> (3) State that positive recruitment is in addition to and will occur during the period of time that the job order is being circulated by the SWA(s) for interstate clearance under § 655.150 of this subpart and will terminate on the actual date on which the H-2Aworkers depart for the place of work, or 3 calendar days prior to the first date the employer requires the services of the H-2Aworkers, whichever occurs first; and

> . . . .

## 20 C.F.R. § 655.158, Duration of positive recruitment.

Except as otherwise noted, the obligation to engage in positive recruitment described in §§ 655.150 through 655.154 shall terminate on the date H-2Aworkers depart for the employer's place of work. Unless the SWA is informed in writing of a different date, the date that is the third day preceding the employer's first date of need will be determined to be the date the H-2Aworkers departed for the employer's place of business.

A-13

**20 C.F.R. § 655.161, Criteria for certification.**

(a) The criteria for certification include whether the employer has established the need for the agricultural services or labor to be performed on a temporary or seasonal basis; complied with the requirements of parts 653 and 654 of this chapter; complied with all of this subpart, including but not limited to the timeliness requirements in § 655.130(b); complied with the offered wage rate criteria in § 655.120; made all the assurances in § 655.135; and met all the recruitment obligations required by § 655.121 and § 655.152.

(b) In making a determination as to whether there are insufficient U.S. workers to fill the employer's job opportunity, the CO will count as available any U.S. worker referred by the SWA or any U.S. worker who applied (or on whose behalf an application is made) directly to the employer, but who was rejected by the employer for other than a lawful job-related reason or who has not been provided with a lawful job-related reason for rejection by the employer.